**UNITED STATES of America**
**v.**
**Gary R. McDANIEL (two cases).**

**UNITED STATES of America**
**v.**
**Gary R. McDaniel et al.**
**Nos. 549, 551, 576.**

United States District Court,
D. North Dakota.
Northwestern Division.

Dec. 13, 1972.

Harold O. Bullis, U. S. Atty., Eugene K. Anthony, Asst. U. S. Atty., Fargo, N. D., for plaintiff.

William R. Mills, Bismarck, N. D., for defendants.

MEMORANDUM OF DECISION

BENSON, Chief Judge.

Gary R. McDaniel, on October 15, 1969, appeared before the North Dakota State

Grand Jury, which was investigating the First Western State Bank in Minot, North Dakota.

Subsequent to his grand jury testimony, McDaniel was indicted on twelve counts by the federal government, and found guilty on eleven of them. In his appeal to the Court of Appeals for the Eighth Circuit, 449 F.2d 832, McDaniel contended that the federal convictions were obtained in violation of his privilege against self-incrimination, for the reason that he testified before a state grand jury under a grant of immunity, which accorded him transactional immunity from all federal prosecution for offenses revealed by the compelled testimony.

## I. THE APPELLATE COURT'S MANDATE

The Court of Appeals, adopting the rationale of Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), declared that the 5th Amendment requires immunity from federal prosecution in all matters relating to the charges—e. g. "transactional immunity".

The Court recognized the distinction where dual sovereigns are involved, one being the questioning sovereign and the other being the prosecutor. In such a case, the 5th Amendment protection would be complete by granting only "use immunity". The situation giving rise to this appeal was one where the federal government saw the grand jury transcript, in effect placing it on the role of both questioner and prosecutor. The Murphy rule requires the federal government to forego prosecution as to those matters to which the prosecution relates. This result cannot be avoided by permitting the state to compel the testimony, and then permitting the federal government to see the testimony.

The Court concluded that if, in fact, McDaniel testified before the state grand jury as to matters related to the federal prosecution, then, since the government has seen the testimony, the indictments should be dismissed.

In remanding for an evidentiary hearing, the Court directed that:

"If the trial court finds that McDaniel testified before the state grand jury *under a grant of immunity* to matters *related* to the instant prosecution or any severable part of them, the charges on which testimony was given must be dismissed . . ." United States v. McDaniel, 449 F.2d 832, 841 (1971). (Italics supplied.)

## II. DID McDANIEL TESTIFY UNDER A GRANT OF IMMUNITY?

Two North Dakota Statutes, each available for immunity have, at one time or another, been cited as a basis for McDaniel's immunity. North Dakota Century Code § 31–01–09, as amended, provides for a conditional grant of immunity if a person refuses to answer on the grounds that he may be incriminated; and if the prosecutor, with the attorney general's approval, requests the court to order the person to answer.

It is clear from reviewing the testimony of the grand jury transcript and the evidentiary hearing transcript, that no immunity under § 31–01–09 was ever afforded McDaniel. The Ward County State's Attorney makes this clear where, in reply to a question posed by the Assistant United States Attorney, he says,

"At this time I said absolutely not, that if Mr. McDaniel testified it would be done so voluntarily; that we would give no grant of immunity under § 31–01–09 . . ." .

The First Assistant Attorney General of the State of North Dakota also renounced any grant of immunity, to-wit:

". . . I opened my remarks to Mr. Kerian by saying that 'we are not going to give any immunity or special consideration for any testimony . . .' "

Despite the above denials, the First Assistant Attorney General does say that at no time *during* the grand jury testimony was McDaniel told that he didn't have immunity. The Ward County States Attorney also admits that McDan-

iel was never specifically told that he did not have to testify.

The grand jury, in its investigation, was concerned with violations of the North Dakota Century Code, Chapters 16–08 (Banks) and 16–20 (Corrupt Practices).

The second statutory reference to immunity is set out in Chapter 16–20–10, North Dakota Century Code, to-wit:

> ". . . No person shall be prosecuted nor subjected to any penalty . . . for . . . any . . . thing concerning which he may testify . . . and no testimony so given or produced shall be used against him upon any criminal investigation or proceeding."

The appellant's attorney, in his reply brief, says that McDaniel testified with this statute in mind, and in fact, was urged to do so by his attorney who was representing him at that time.

The Government, in its brief, asserts the main question is whether McDaniel testified with reliance on Section 16–20–10, or whether it was voluntary. The government contends the latter is true, charging that the only purpose in his testifying was to construct a defense by implicating everyone else. In his grand jury testimony, McDaniel comments that,

> "I made the decision, and my lawyers made the decision for me . . . to go in this direction . . . it's the course I've chosen . . ."

Reliance is placed on this statement by the government to show that McDaniel was not under any compulsion to testify, that it was of his own volition.

Appellant's attorney, however, reads this passage as substantiation for the position that McDaniel's attorney (at that time), made the decision to testify based upon his knowledge of § 16–20–10. This position does have weight, in that McDaniel's attorney did talk to the First Assistant Attorney General some time prior, and was informed that no immunity under § 31–01–09 would be forthcoming.

Appellant's attorney also bases his compulsory testimony position on the fact that McDaniel was subpoenaed. This, according to him, is compulsion.

Countering this, the government replies that the subpoena was issued only so that McDaniel could have free transportation, and that both he and his attorneys were well aware of the government's position on a grant of immunity. The government never distinguishes between § 31–01 immunity, and § 16–20 immunity, and repeatedly refers to a "grant" of immunity. It is noted that a "grant" is not necessary under § 16–20–10, it being an automatic application. This same section also seems to compel testimony by the words, "no person shall be excused . . ."

This is the position that North Dakota District Judge Coyne took when he reviewed this issue on March 30, 1970. Although the government maintains McDaniel went to the grand jury voluntarily, its position cannot be sustained. Judge Coyne asked: "How do you compel a witness to testify, other than by subpoena?" To which the Ward County States Attorney replied there was no immunity because McDaniel did not refuse to testify, nor did the state give him a grant of immunity. The Judge determined that immunity was afforded automatically by the provisions of § 16–20–10, and that under said provision, McDaniel could not refuse testimony on the grounds of self-incrimination. "16–20–10 clearly indicates that he must give testimony." If this is a correct position, then it would have been pointless for McDaniel to have refused or to have made objections at the proceedings.

It would have been impossible for McDaniel to testify for 472 pages on matters related to the investigation of the bank, without giving evidence relating to his own conviction.

■ Referring to Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 the court held that no immunity statute which leaves the party subject to prosecution after he answers

the criminating question, can have the effect of supplanting the privilege against self-incrimination. Such a statute is valid only if it supplies a complete protection from all the perils—transactional immunity. From this authority then, it is clear that § 16–20–10 must afford a witness complete immunity as to all incriminating matters. See *McDaniel, supra,* 449 F.2d at 836.

Although the government contends that McDaniel's testimony before the grand jury related only to charges of bribery and corruption, under the rationale of the decision of the Court of Appeals, he still may have immunity as to other matters.

"The test, however, of whether immunity has been acquired in return for compelled testimony is not what legal labels are attached to the criminal conduct which is the subject of the incriminating testimony, but whether the conduct revealed by the compelled testimony is related to the subject matter of the federal prosecution . . . ." United States v. McDaniel at 840.

The government further contends that this relationship must be a 'substantial' relationship. It would seem that had this been the intent of the appellate court, it would have been specifically set out—it was not. On pages 840 and 841, the court sets out the phrase "matters related" some four times. As basis for its assertion of a "substantial relationship" requirement, the government cites United States v. Marcello, 423 F.2d 993 (5th C.A. 1970); United States v. Onassis, 125 F.Supp. 190 (D.C.1954); and United States v. Zirpolo, 288 F.Supp. 993 (D.N.J.1968). A review of these cases does not lead this court to the government's position.

*Marcello* disallowed the privilege because "no matter what the answer might have been, it could not *possibly* result in, or present evidence leading to, any criminal or civil liability. . . ."

In *Onassis*, the court read the grand jury minutes with the following consideration in mind . . . "that the facts concern a matter as to which the answer *might* with *reasonable* possibility be incriminating." 'Reasonable possibility' does not connote 'substantial relationship'.

*Zirpolo* says "No immunity could arise under the cited sections of the Act (Interstate Commerce Act) unless the testimony given before the grand jury *touched* in some substantial and not remote way, on the subject matter of the [Act]."

Here, the court did not use the word 'relate' but rather contrasted 'substantial touching' with 'remote touching'— two absolutes.

These sources indicate that 'relate' means something more than a remote possibility, but they do not establish a 'substantiality' factor. In fact, the meaning of the word by itself is enough.

"Relate—To connect . . . ."
Websters New International Dictionary, 2nd Edition, Unabridged, 1956.

Accordingly, nothing more is needed nor intended by either the appellate court or the government's cited authority.

## III. DID McDANIEL TESTIFY TO MATTERS RELATED TO THE FEDERAL CHARGES?

What follows is a breakdown of each count and portions of various transcripts, all going towards the question of the relationship between the matters testified to before the grand jury and the federal prosecution. After reading the entire grand jury transcript, it is this Court's finding that the testimony as to various bank practices cannot discernably be separated from material incriminating to McDaniel. All counts in some way are connected to the shortage of $214,900.00, and as president of the bank, McDaniel is obviously implicated.

CRIMINAL 551—Minot

Verdict on July 29, 1970.

Count #1—Guilty—Embezzlement–$5,000.00–Ranger Bar down payment transaction—Laurel & Leslie Snyder.

Testimony— McDaniel identified the check involved. This is the only place where direct reference is made to this transaction. Of course, by way of implication, it would have been mentioned as a part of the whole in other testimony on cover-up notes.

Count #2—Guilty—Embezzlement–$4,683.15–Ranger Bar liquor inventory—Laurel & Leslie Snyder.

Testimony— McDaniel never expressly defined this transaction except as a part of the cover-up notes.

"So you have to understand that we're talking about checks and cash . . . if one of you came into our bank and write a thousand dollar check and we give you a thousand dollars worth of cash, and your account is at, say, First National Bank of Minot, and that check bounces and comes back to us, then we've got to do two things (sic) we've either got to charge it off against losses, or we put it into this account called "cash items" . . . And this was pretty much an operation that ran through the whole period of time, and it was a situation to where *the records had to be destroyed* on the cash item situation . . . because the Bank Examiners would then question these cash items . . . I was aware that these were being destroyed over the years. This was just as much a part of what was going on as the loans to Leonard Pietsch that were not legitimate situations."

Count #3—Guilty—Embezzlement – $47,954.05 – Ranger Bar down payment—Laurel & Leslie Snyder.

Testimony— McDaniel never refers to this amount except as it is a part of the floating notes.

Count #4—Guilty—False Entry–$51,637.20–First National Bank of Minneapolis—Ranger Bar deal.

Testimony— McDaniel never testifies to this transaction with any specifics.

All of the above transactions were covered by the Pietsch notes which McDaniel testified to and subsequently became government's Exhibits 1, 2, 3, 4 in the trial of Criminal 551. Reference is made to these notes throughout the grand jury testimony. The government calls this relationship 'remote'. In this regard, there is a connection between the charges and the testimony. The appellant says that in testifying as to the Pietsch notes, he was testifying to matters related to the instant charges. This Court does not think the two can be separated.

The government itself admits to the materiality of the notes:

"The United States does not dispute that these exhibits were a very material part of its prosecution. It does, however, dispute, that McDaniel gave any testimony concerning these exhibits which meet the guidelines set forth in Onassis and Marcello."

As previously explored, the mandate from the Appellate Court does not require a "substantial" relationship.

CRIMINAL 576

Verdict October 3, 1970.

Count #1—Guilty—Embezzlement – $10,000.00 – Willie Becker.

Testimony— There is no direct testimony on this transaction, except as it is a part of the whole.

CRIMINAL 549

Verdict October 30, 1970.

Count #1—Dismissed—Embezzlement or misapplication–$10,000.00–Willie Becker note.

Count #2—Guilty—Embezzlement – $27,000.00 – National City Bank–Home loan to McDaniel.

Testimony— McDaniel says part of the $216,-000.00 is legitimate debt of his, but relates how he secured the *home loan. In his grand jury* examination, the First Assistant Attorney General discusses a loan floating scheme followed by the bank. Mr. McDaniel replies "I suppose you'd have to say it's probably the poorest excuse for a loan that there is, because it's non-interest bearing and it was just a little piece of paper . . . And there was also a number of cases where cashiers' checks would be issued—an example being my house loan. I owed $27,000 to National City Bank, and when I paid that—I paid it with a cashier's check. That cashier's check didn't result in a loan for approximately *a month or so; in other words,* there was . . . I use my-

self as an example . . ." What he did testify to was, however, related to the federal charge. The government says that McDaniel's statements were voluntary, however, the following question was asked: "How did First Western become the first mortgage holder?" The response given is the foregoing answer.

Count #3—Guilty—Embezzlement — $11,200.00 — Purchase of securities by Sheryl Bergstrom.

Testimony— Statements made by McDaniel at the grand jury hearing are directly on this point.

Counts #4 & #5— Guilty—Embezzlement — $3,100.00 and $3,416.00 respectively — Tom Burgum campaign.

Testimony— McDaniel admitted he went along with the others to support Burgum. In connection with this, McDaniel speaks of the amount spent on Burgum. The government says this material does not relate to the charges in Counts 4 and 5. The financing of the Burgum campaign is certainly a matter related to the instant charges.

Count #6—Guilty—False Entry—$216,000.00 in First National City Bank of Minneapolis.

Testimony— Many pages of transcript, taken together, become rather substantial foundation. They all *relate* to the amount of $216,000.00.

Count #7—Guilty—Overstatement of general loan account.

Testimony— ". . . the account would get to be overdrawn $3,000 or whatever the figure would be; so then there'd be a note. . ." The First Assistant Attorney General asks, "Then they would write checks on this account and as it became overdrawn, it was subsequently supplied with a note to cover the overdraft?" McDaniel replies, "That's right".

Reading the government's comments appendant to each of the counts, the major discrepancy between its interpretation of the testimony and the appellant's impression is one of definition and application. Whether the word "relate" is to be given a broad meaning or narrow; whether each instance of testimony is to be viewed individually or collectively.

Taken as a whole, the 472 pages of grand jury transcript implicate McDaniel in every aspect of the various schemes. The insignificancy appears only when a line or page is viewed as a complete unit.

The appellate court in the McDaniel case, supra, 449 F.2d at 837, in adopting the Murphy rule, holds that the purpose of this rule can be accomplished only if the federal government is forbidden not only to introduce the testimony as evidence or to *obtain investigatory leads from it*, but is also forbidden to see it.

The court also employs the words, "any matters relating to". Credence was also given to the dismissal of state charges because they were covered by McDaniel's testimony relating to bank practices. This court concludes from this that the appellate court intended a broad application of its order requiring the transcript and testimony reviewed as a whole.

■ For the reasons stated in the foregoing memorandum opinion, this Court concludes that the appellant did testify under a grant of immunity to matters related to the federal charges.

Accordingly, pursuant to the mandate, the eleven charges upon which the appellant was convicted must be dismissed.

If, however, this Court were to review the same evidence in light of Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), decided by the United States Supreme Court since the appellate court's McDaniel decision, the convictions would stand.

## IV. EFFECT OF KASTIGAR.

Were the more recent Supreme Court decision of *Kastigar*, supra, given effect in the evidentiary problem before us, the result would be opposite. *Kastigar* is distinguishable from United States v. McDaniel, in its interpretation of the immunity necessary to supplant the con-

stitutional privilege against self-incrimination.

On page 839 of its opinion, the McDaniel court states (relying on Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892)) that 'transactional immunity' is necessary where the questioning sovereign is also the prosecutor. Contra, *Kastigar* does not follow *Counselman* in this position. "Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege.", *Kastigar*, supra, 406 U.S. at 453, 92 S.Ct. at 1661. Accordingly, the court in *Kastigar* concluded that "Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom affords this protection."

Application of the *Kastigar* ruling to the instant hearing would dissolve the review of whether the testimony "related to" matters of federal prosecution. The main inquiry would be whether the United States derived its evidence in the McDaniel prosecution from legitimate sources wholly independent of the compelled grand jury testimony.

On the basis of the government's offer of proof in the McDaniel evidentiary hearing, this Court finds that the government had, prior to the grand jury testimony, all the evidence used in its McDaniel prosecution, and further finds that evidence was derived from legitimate sources wholly independent of the compelled testimony. This evidence consists of comprehensive investigative Federal Bureau of Investigation reports. See Government's Offer of Proof, Exhibits 36–41 inclusive.

If the Kastigar rule is made controlling in this case, the McDaniel convictions must stand. Under the mandate of the Court of Appeals, this Court has no discretion and must vacate the judgments of convictions and dismiss the charges.

It is so ordered.