UNITED STATES of America,
Plaintiff,

v.

Earl H. HENDERSON, Defendant.

Crim. A. No. 74–160.

United States District Court,
D. Delaware.

Aug. 19, 1975.

---

W. Laird Stabler, Jr., U. S. Atty., Wilmington, Del., for plaintiff.

Arthur Inden of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

This case presents questions of the scope of the protection afforded to an individual who is compelled, under a grant of immunity, to testify over his claim of the Fifth Amendment privilege against self-incrimination.

On November 12, 1974, Earl H. Henderson appeared, pursuant to subpoena, before a federal grand jury in this District. When asked certain ques-

tions, he refused to answer on the ground that his answers might tend to incriminate him. The government then applied to the Court for an order compelling Henderson to testify under the federal witness immunity statute, 18 U.S.C. § 6003.[1] The Court issued the order, as required by the statute.[2] *In re Grand Jury Proceedings (Earl H. Henderson),* C.A. 74–240 (D.Del., Order of Nov. 12, 1974). Henderson then testified before the grand jury—under threat of being held in contempt of court if he refused to do so—on four separate occasions: November 12, 13, 20 and 26, 1974. His testimony filled nearly 800 pages of transcript.

At the same time as it applied for an order to compel Henderson's testimony, the government submitted to the Court an envelope containing copies of certain documents which were said to contain evidence of violations of federal law by Henderson. The government requested the Court to receive and seal this envelope so as to preserve a record of its possession of this evidence prior to Henderson's compelled testimony.[3] The

Court ordered the envelope to be sealed and filed. *In re Grand Jury Proceedings (Earl H. Henderson), supra.*

On December 17, 1974, Henderson was indicted by a different grand jury on three counts of racketeering offenses, 18 U.S.C. §§ 1951, 1952(a)(3), all involving transactions about which he had been compelled to testify.

Section 6002 of the immunity statute provides that a witness who is presented with an order issued under Section 6003 must testify, but that

> no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

Henderson has moved to dismiss the indictment against him on the grounds that it was obtained in violation of this section, and of the Constitution, through the use of his compelled testimony. The

---

1. Section 6003 provides:

    (a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

    (b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

    (1) the testimony or other information from such individual may be necessary to the public interest; and

    (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

2. The affidavit and motion of the United States Attorney for the District of Delaware stated that the information was sought in good faith, that it was necessary to the public interest and material to an ongoing investigation into local government corruption, and that Henderson had refused to answer certain questions put to him on the grounds of his privilege against self-incrimination. Attached to the motion was a letter from Henry E. Peterson, Assistant Attorney General, Criminal Division, authorizing the application. Mr. Peterson was a "designated Assistant Attorney General," as required by Section 6003(b), under 28 C.F.R. § 0.175. When the requirements of the statute have been fulfilled, the Court has no discretion to deny the order sought. *In re Grand Jury Investigation,* 486 F.2d 1013, 1016 (3rd Cir. 1973), *cert. denied,* 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974). Cf. *Ullman v. United States,* 350 U.S. 422, 431–34, 76 S.Ct. 497, 100 L.Ed. 511 (1956) (construing analogous statute).

3. This prophylactic procedure was suggested in Note, *Standards for Exclusion in Immunity Cases After Kastigar and Zicarelli,* 82 Yale L.J. 171, 182 (1972), and endorsed in *Goldberg v. United States,* 472 F.2d 513, 516 n. 5 (2nd Cir. 1973).

motion raises questions of law and of fact.

## I.

■ The initial issue presented by Henderson's motion is whether, assuming that the indictment against him was obtained with the use of his compelled testimony, it should be dismissed. He argues that this is necessary to accomplish the complete prohibition on use which he contends the statute, and the Constitution, require. He notes that dismissal of such an indictment has been ordered in *United States v. McDaniel,* 352 F.Supp. 585 (D.N.D.1972), *aff'd,* 482 F.2d 305, 312 (8th Cir. 1973), and in *United States v. Dornau,* 359 F.Supp. 684, 687 (S.D.N.Y.1973), *reversed on other grounds* (but see n. 15, at 481), 491 F.2d 473 (2nd Cir.), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974).

■ The government's response is that the question has been decided to the contrary by *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), which stated:

[A]n indictment valid on its face is not subject to challenge . . . on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination, *Lawn v. United States,* 355 U.S. 339 [78 S.Ct. 311, 2 L.Ed.2d 321], (1958).

414 U.S., at 345, 94 S.Ct., at 618. Henderson correctly points out that this statement of the *Calandra* court is merely *dictum.*[4] However, the *Lawn* case, upon which the statement relies, involved a situation much like the one here presented. The significant facts of *Lawn* are not complex. Petitioners showed that they had been compelled to testify before a grand jury in violation of their privilege, and that an indictment later returned by another grand jury in the same district had charged them with the crime about which they had testified. The court held that they were not entitled to a pre-trial hearing to show that the indictment was secured on the basis of evidence obtained in violation of the Fifth Amendment. Implicit in that holding was a determination that even if such evidence was put before the indicting grand jury, dismissal of the indictment would not be required. A number of commentators have, with some justification, tried to read this implication out of *Lawn.*[5] What counts, however, is that the Supreme Court, both in *United States v. Blue,* 384 U.S. 251, 255 n. 3, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), and in *Calandra,* has read *Lawn* as standing for that proposition.

■ Unless *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the case which upheld the constitutionality of the immunity statute used to compel Henderson's testimony here, requires a different result, I think *Lawn* is controlling. *Kastigar,* as the defendant points out, held that the immunity statute there at issue and here

---

**4.** *Calandra* is a Fourth Amendment case. The judicially created Fourth Amendment exclusionary rule, see *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and the constitutionally mandated exclusion of evidence obtained in violation of Fifth Amendment rights rest upon different grounds, and are not subject to the same analysis. Compare *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 413, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966) and *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 411, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting), with *Adams v. Maryland,* 347 U.S. 179, 181, 74 S.Ct. 442, 98 L.Ed. 608 (1954) and *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). See generally, *Note, supra* n. 3, 82

Yale L.J., at 175–78; *The Supreme Court, 1971 Term,* 86 Harv.L.Rev. 1, 185–186 (1972).

**5.** See *Jones v. United States,* 119 U.S.App.D.C. 284, 342 F.2d 863, 871–73 (1964) (en banc) (opinion of Edgerton, Bazelon, Fahy & Wright, JJ.); *Note, Disclosure of Grand Jury Minutes to Challenge Indictments and Impeach Witnesses in Federal Criminal Cases,* 111 U. of Pa.L.Rev. 1154, 1159–63 (1963); *cf. Goldberg v. United States,* 472 F.2d 513, 516, n. 4 (1973). But see *Jones v. United States, supra,* at 882 (opinion of Prettyman, Miller, Danaher & Bastian, JJ.); *United States v. Addonizio,* 313 F.Supp. 486, 494 (D.N.J.1970), *convictions affirmed,* 451 F.2d 49 (3rd Cir. 1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). See also cases cited in n. 7, *infra.*

employed was constitutional because, and only because, the protection it afforded to a witness who asserted his Fifth Amendment privilege was "coextensive" with the protection afforded by the privilege itself. 406 U.S., at 449, 459, 92 S.Ct. 1653. Henderson argues that indicting a person based on testimony compelled from him certainly does not leave him in "substantially the same position", 406 U.S., at 462, 92 S.Ct. 1653, as he would have been in had he been permitted to remain silent. The quoted observation of the *Kastigar* court must be read in context, however. In order to determine whether the protection granted by immunity is "coextensive" with the protection afforded by the privilege one must examine the scope of the protection of the privilege. The Supreme Court has repeatedly recognized that the "sole concern [of the privilege against self-incrimination] is, as its name indicates, with the danger to a witness forced to give testimony leading to the inflicting of 'penalties affixed to the criminal acts . . . .' *Boyd v. United States,* 116 U.S. 616, 634 [6 S.Ct. 524, 534, 29 L.Ed. 746] [1886]." *Ullman v. United States,* 350 U.S. 422, 438–9, 76 S.Ct. 497, 507, 100 L.Ed. 511 (1956).[6] This recognition has played a significant role in a long line of Supreme Court cases relating to immunity, of which *Kastigar* is only the most recent. *Kastigar* expressly reaffirmed *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), and *Ullman v. United States, supra,* and in both of those cases the court rejected the argument that an immunity statute, in order to pass constitutional muster, must grant protection from the consequences of compelled testimony beyond protection against conviction for crime. In *Brown,* for example, the petitioner attacked the constitutionality of a transactional immunity statute

partly on the ground "that the constitutional safeguard goes towards relieving the witness from the danger of an accusation being made against him while the statutory immunity forces him to supply evidence leading to an accusation and provides only a means for defense [and]; that the statute puts a heavy burden on petitioner, if he is indicted, to prove that he had testified concerning the matter for which he was indicted . . . .." *Ullman v. United States, supra,* 350 U.S. at 437, n. 13, 76 S.Ct., at 506 (describing the arguments rejected in *Brown* ). The *Brown* court answered these arguments as follows:

> The same answer [i. e. that the danger relied upon "was never the object of the [Fifth Amendment] to obviate"] may be made to the suggestion that the witness is imperfectly protected by reason of the fact that he may still be prosecuted and put to the annoyance and expense of pleading his immunity by way of confession and avoidance. This is a detriment which the law does not recognize. There is a possibility that any citizen, however innocent, may be subjected to a civil or criminal prosecution, and put to the expense of defending himself; but, unless such prosecution be malicious, he is remediless, except so far as a recovery of costs may partially indemnify him.
>
> · · ·

161 U.S., at 608, 16 S.Ct., at 651.

Given this context, I cannot conclude that *Kastigar* requires a result different from that dictated by *Lawn* as construed in *Calandra* and *Blue.* Defendant's present motion could be denied as a matter of law solely on the authority of *Lawn.* Recognizing, however, that other authorities suggest the contrary conclusion,[7] I consider it appropriate to pass upon the government's alternative factual contention that none of the evidence

---

6. See 8 *J. Wigmore, Evidence,* § 2255 (McNaughton rev. 1961); *C. McCormick, Evidence,* § 121 (2d ed. 1972).

7. See *United States v. De Diego,* 511 F.2d 818, 821 (D.C.Cir.1975); *United States v. McDaniel* 482 F.2d 305 (8th Cir. 1973); *United States v.*

*Dornau,* 356 F.Supp. 1091, 1099 (S.D.N.Y. 1973), *reversed on other grounds,* 491 F.2d 473 (2nd Cir.) (but see n. 15, at 481; compare *United States v. James,* 493 F.2d 323, 326 n. 4 (1974)), *cert. denied,* 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79 (1974); *The Supreme Court, 1971 Term,* 86 Harv.L.Rev. 1, 186 (1972).

presented to the indicting grand jury was tainted by Henderson's compelled testimony.

## II.

■ In *Kastigar v. United States, supra,* the Supreme Court stated the method by which a witness would be protected against the use of his compelled testimony:

> Once a defendant demonstrates that he has testified, under a . . . grant of immunity, to matters related to the . . . prosecution, the . . . authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence. [Quoting from *Murphy v. Waterfront Comm'n.,* 378 U.S. 52, at 79 n. 18, 84 S.Ct. 1594, at 1609, 12 L.Ed.2d 678 (1964)].

406 U.S., at 460, 92 S.Ct., at 1665. Out of an abundance of caution, an evidentiary hearing has been held in this case to allow the government to attempt to demonstrate that the evidence presented to the indicting grand jury was derived solely from "independent, legitimate" sources. I assume, *arguendo,* that such a showing must be persuasive beyond a reasonable doubt in order to succeed.[8]

### A. *Evidentiary Use.*

It is of major importance to note that the indictment against Henderson was returned by a different grand jury from the one before which he testified. There was thus no direct exposure of the indicting grand jury to the testimony given under the immunity order; whether there was any direct or derivative evidentiary use of his testimony before the indicting grand jury can be determined by an examination of the testimony there presented. Each count will be examined in turn.[9]

### COUNT I

■ The first count of the indictment charges in essence that Henderson crossed a state line in the process of extorting money from one William W. Bassett, Jr. and one Evans R. Jackson in violation of 18 U.S.C. § 1952(a)(3). The only evidence presented to the indicting grand jury relating to this Count was the testimony of Evans R. Jackson and William W. Bassett, Jr. Each of these men had testified before another grand jury on August 6, 1974, more than three months before Henderson's compelled testimony. The Assistant United States Attorneys simply read to the grand jury

---

8. It is settled that the standard for determining the voluntariness of a confession is that of a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). It follows *a fortiori* that the standard for determining whether particular evidence was the "fruit" of a coerced confession is the same. *United States v. Cole,* 463 F.2d 163, 172 n. 14 (2nd Cir.) (Friendly, J.), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972). And see *United States v. Matlock,* 415 U.S. 164, 177–78 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). In *Kastigar,* the court analogized the suppression of coerced confessions to the prohibition on the use of compelled testimony. 406 U.S., at 461, 92 S.Ct. 1653. The Fifth Circuit has applied the analogy in this context. *United States v. Seiffert,* 501 F.2d 974, 982 (1974).

It has been argued, however, that the standard in immunity cases should be more stringent, since in such cases—unlike wiretap or coerced confession cases—the government has the ability both to marshal its legitimate evidence in advance of obtaining the compelled testimony, and to insure that no opportunity for infection occurs. A stricter standard would impose upon the government an incentive to take advantage of these abilities. See *The Supreme Court, 1971 Term,* 86 Harv.L. Rev. 1, 187–88 n. 40 (1972); *Note, supra* n. 3, 82 Yale L.J., at 179 n. 46, 182 n. 59; *Note, Witness Immunity Statutes: The Constitutional and Functional Sufficiency of "Use Immunity",* 51 B.U.L.Rev. 616, 660–63 (1971).

9. With Court approval, the government has voluntarily made available to the defendant copies of the transcript of his own compelled testimony, the transcript of the testimony before the grand jury which indicted him, and relevant documents from the envelope sealed prior to his testimony, in order to enable him adequately to litigate this motion.

the transcript of the August 6th testimony.[10] The independent, legitimate nature of this evidence is thus apparent.

■ After the evidentiary hearing on defendant's motion to dismiss the indictment, it was brought to the attention of the Court that there was an off-the-record discussion before the grand jury, prior to the reading of the testimony, which was not taken down by the reporter.[11] The government asserts that this discussion was merely the Assistant United States Attorney's explanation to the grand jury that transcripts of previously recorded testimony were going to be read.[12] This is certainly a reasonable explanation, and I conclude that the government has carried its burden with respect to Count I.

## COUNT II

■ The second count charges that Henderson extorted one Alvin T. Schwartz, in violation of 18 U.S.C. § 1951. The only evidence presented to the indicting grand jury on this count was Schwartz's testimony, and once again, it was done by reading into the record his testimony given before another grand jury prior to Henderson's compelled testimony.[13] At the conclusion of this reading, the Assistant United States Attorneys spoke directly to the grand jury for a few minutes, in order to explain to them a portion of Schwartz's testimony which might otherwise have been unclear. The relevant passages are set out in the margin.[14]

10. The shorthand notes of the court reporter taken at the presentation to the indicting grand jury have been carefully compared by the reporter with the original transcript of the August 6th testimony. There were no differences between the original of Bassett's testimony and what was read to the indicting grand jury. There was one discrepancy in Jackson's testimony: before the indicting grand jury, one of the Assistant United States Attorneys began to read a question which had been put to Jackson as follows:

Q It is fair to say you were concerned about your personal safety and . . . ."
This was a misreading of the question. The reader then stopped and reread the question correctly, as follows:
Q So, it is fair to say you were concerned not only about your personal safety and that of Mr. Bassett, . . . .
The slip was obviously harmless.

11. While it may be the better practice to record everything that occurs before the grand jury, see *United States v. Lardieri*, 497 F.2d 317, 318 n. 2 (3rd Cir. 1974), this is not required. *United States v. Crutchley*, 502 F.2d 1195, 1200 (3rd Cir. 1974).

12. This explanation appears in the government's reply brief written by one of the Assistant United States Attorneys who was present at the grand jury proceedings. Of course, "a statement in a brief . . . does not constitute evidence." *Tunnell v. Wiley*, 514 F.2d 971, 975 n. 5 (3rd Cir. 1975). It is, however, understandable that the government attorney's recollection on this specific point was not sworn to in his affidavit or testimony at the evidentiary hearing, since the fact that such an

unreported discussion had occurred did not come to anyone's attention until much later. The pre-hearing affidavit of one of the prosecuting attorneys does swear that "The . . . Grand Jury did not hear any other evidence pertaining to the incidents alleged in this indictment other than that set out in the transcript of December 17, 1974 [i. e. of the proceedings before the indicting grand jury]."

13. In the middle of reading Schwartz's testimony, the indicting grand jury took their lunch recess. When they reconvened, the Assistant United States Attorney recalled for them, in two sentences, where they had been when they broke off. There was also one occasion where the Assistant United States Attorney began to misread a question, stopped, and corrected himself. Neither of these occurrences distorted Schwartz's testimony.

14. From Schwartz's testimony:
Q [By Assistant United States Attorney Hooper]:
Do you know if Henderson has ever taken any steps to attempt to change your testimony or attempt to in any way put the pressure on you to keep you from testifying in a certain way or testifying at all?
A I don't know of any first-hand knowledge. I only know hearsay, second-hand knowledge of such a thing.
Q What sort of hearsay, second-hand knowledge do you have?
A I heard from my attorney. All right? From Conti [sic], who heard from another party and that somebody went to his office, this third party, and told him to tell me to say something other than I paid Henderson for these services. And I don't know what's that worth, but that's . . .

The defendant contends that the government has not proved that this explanation was derived from a source independent of his compelled testimony. The government's proof is to note, as did the explanation in the transcript, that the event referred to was a conversation with one Emmett Conte at which both Assistant United States Attorneys were present, and that their sources of information were thus their own first-hand memories. The government has also submitted an FBI interview report prepared by Agent James D. Snyder, who interviewed Mr. Conte immediately after Conte's conversation with the Assistant United States Attorneys. This report, which was one of the documents placed in the envelope which was sealed before Henderson's testimony, corroborates the accurate nature and legitimate source of the explanation given to the grand jury.[15] The defendant makes much of a few small differences between Agent Snyder's report and the explanation given to the grand jury. If there was any way to trace these difficulties to his compelled testimony, the matter might be cause for concern. But he has pointed to nothing in his testimony concerning this phone call, and the Court's own search has revealed no such reference.

The government has clearly met its burden as to Count II.

## COUNT III

■ The third count charges that Henderson extorted one Uldis Karins, in violation of 18 U.S.C. § 1951. The presentation to the indicting grand jury on this count consisted solely of the live testimony of Mr. Karins. Three statements he had given to the FBI were among the items placed in the envelope sealed before Henderson's testimony was compelled. Two of these statements refer specifically to the single alleged incident of extortion which is charged in the indictment, and, in particular, to the payment of $300 by Karins to Henderson as a result of (1) Henderson's suggestion that in return for such a payment he could arrange to get Karins more engineering work in New Castle County and (2) Karins' fear that a failure to make the requested payment might result in injury to Karins' business.

Before the grand jury, Karins was first asked background information about his present and past employment. After next testifying about how he met Henderson in connection with his (Karins') work on a particular construction

---

Q This is third hand hearsay?
A. Third hand, maybe even fourth hand hearsay.
The explanation:
MR. HOOPER: That is the end of Mr. Schwartz's testimony.

The reference in here where he is talking about third hand hearsay relates to a conversation between Mr. Thall and myself, Emmet Conti [sic], who is representing Mr. Schwartz during the course of time that he came to our office to explain this to us and Mr. Schwartz in which he was indicating that the previous night—this is Mr. Conti [sic] indicating this—Mr. Henderson had called him up and told him, look I'm in trouble. I made a couple mistakes, I've got kids. Is there anything you can do for me. Basically that was it. And Conti [sic] told him, look I don't want to hear anything you want to say. Anything you tell me is going to go straight to the United States Attorney's office. I am not the one you should talk to. And he hung up basically. And that is what

Mr. Schwartz was referring to being third or fourth hand hearsay.
MR. THALL: But the person to whom the phone call was made, Mr. Conti [sic], was the person who related this to us in the presence of Mr. Schwartz.

15. The report reads in full as follows:
EMMETT J. CONTE, JR., Attorney At Law, 1102 West Street, Wilmington, Delaware, furnished the following information:
At approximately 7:30 P.M. on March 25, 1974, CONTE received a telephone call at his residence from an individual who identified himself as and who CONTE recognized as being EARL HENDERSON. HENDERSON inquired of CONTE whether it would be an imposition for he (HENDERSON) to visit CONTE at CONTE'S residence for about five minutes to discuss a matter with CONTE that evening. CONTE advised HENDERSON that he (CONTE) represented a client who could have interests which would be in conflict with the interests of HENDERSON and indicated to HENDERSON that it might

project, the following colloquy took place:

Q Did you have any other discussions with Earl Henderson?

A Well, after the matter of the engineering work for Summerhill was settled then Mario Capano left my office and Earl Henderson stayed on.

Q And what was the purpose for his staying on?

A Well, he made a proposal that he could get me work for engineering projects.

Q What were the terms of his proposal?

A Well, the terms were ten percent of my fees.

Q Did he indicate to you what type of work he could get for you?

A Well, he talked about many things. What I understood from the conversation was that he would be able to get me County work, probably some State work, and development work.

BY MR. THALL:

Q Would it be fair for me to state that after Mr. Capano left the meeting Mr. Henderson indicated to you that in return for ten percent of the fees that you would realize from doing engineering work he would get projects for you that would be either County work, State work or private work?

A That is my understanding of the conversation.

Karins then went on to testify about his cash payment of $300 to Henderson and his reasons for making that payment.

Henderson stresses that the two prior Karins' statements—which are acknowledged by the government to reflect "the total information that it had" concerning a Karins-Henderson relationship prior to the Henderson compelled testimony—contained no reference to an arrangement that 10% of Karins' fees would be paid to Henderson. Reference was, however, made to a 10% arrangement in the Henderson compelled testimony. Relying on these facts as well as the fact that one of the prosecutors spoke privately to Karins immediately prior to his grand jury testimony, Henderson maintains that the government has not proved an absence of taint. To the contrary, Henderson argues that the only explanation for Karins having "changed his version" of the facts is that "information previously obtained only from the defendant was added [by suggestion of the prosecutor] and became part of Karins' testimony before the grand jury."

The Assistant United States Attorney involved testified at the evidentiary hearing that he did not review Henderson's testimony with Karins or otherwise suggest to him what to say to the grand jury. Henderson acknowledges this testimony but maintains that it is insufficient to carry the government's burden because of *Kastigar's* promise that:

A person accorded this immunity under 18 U.S.C. § 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities.

406 U.S., at 460, 92 S.Ct., at 1665.

In this case, however, the good faith of the prosecuting attorney is not the only assurance in the record that the grand jury testimony regarding a 10% arrangement was not the fruit of the compelled testimony. We know that the government was aware of Karins and the incident referred to in the indictment before the compelled testimony

not be wise for HENDERSON to converse with CONTE.

HENDERSON replied to CONTE that he (HENDERSON) had known CONTE for about 20 years and that he (HENDERSON) was married, had six children, and was concerned about his wife and children. HEN-

DERSON went on to state that he may have made a mistake and that he needed a break.

CONTE stated that he told HENDERSON that it would be wise for HENDERSON to discuss this matter with his own attorney. The telephone call was then terminated.

took place. The Karins' testimony about a 10% arrangement came from Karins' own first-hand knowledge obtained prior to that testimony and was merely a background detail that Karins referred to before the grand jury in recounting the basic story which he had previously related to the government. On this record, it seems to the Court that the government has clearly established an independent source for all evidence presented to the grand jury in support of Count III whether or not the 10% arrangement was mentioned at the conference prior to Karins' grand jury testimony.[16]

Even if the government has not carried its burden on the point, however, the testimony about a 10% arrangement would not require dismissal of Count III. The 10% explanation was, in the context of Karins' testimony, insignificant. Karins testified unequivocally to other facts which, if believed, would satisfy each element of the crime charged in Count III. Since Karins was the only witness presented in support of this Count of the indictment, it is apparent that the grand jury found his testimony credible. The challenged portion of his testimony merely provided background for the critical testimony that Karins paid Henderson $300 as a result of being put in fear by Henderson's request. I cannot say that this crucial testimony was rendered any more believable by the testimony that the amount of this payment was arrived at because it constituted 10% of Karins' fee. Accordingly, any taint, if taint there was, was harmless beyond a reasonable doubt, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and does not provide sufficient reason for dismissing this count of the indictment.

### B. *Non-Evidentiary Use.*

██ As previously noted, the same Assistant United States Attorneys conducted both the grand jury proceedings at which Henderson testified, and the proceedings before the different grand jury which indicted him. Henderson argues that the prosecutor could not erase the compelled testimony from his mind while presenting the case to the grand jury and that this practice alone demonstrates that the prosecution did not refrain "from using the compelled testimony in *any* respect." *Kastigar, supra*, 406 U.S., at 453, 92 S.Ct., at 1661 (emphasis in original). Thus, it is suggested that the indictment against him was obtained in violation either of the immunity statute or of the Constitution.

Assuming that the Fifth Amendment protects against such "non-evidentiary" use, I find this argument unpersuasive on the facts of this case. As any prosecutor is aware, strategy plays a far less significant role in a grand jury presentation than in the trial of the case. Instances can nevertheless be hypothesized where a prosecutor's knowledge of a defendant's compelled testimony could be applied to prejudice the defendant before a grand jury which was being asked to indict him. Prejudice might occur, for example, if this knowledge enabled the prosecutor to present his evidence selectively, so as to remove that which was exculpatory and present only that which was incriminating. But this is not that case. The full texts of the Bassett, Jackson and Schwartz testimony were read, and Karins testified to all that he had previously revealed. In short, I think it clear that the presentation to the grand jury would have been substantially the same in this case if there had been no compelled testimony.

### III.

██ In the course of briefing the motion to dismiss, the defendant suggested that the record thus far compiled demonstrates that a trial cannot possibly be held in this case consistent with the requirements of *Kastigar*. This was urged as an alternative ground for dis-

---

16. See *e. g., United States v. Sterling*, 369 F.2d 799, 802 (3rd Cir. 1966) (search warrant case); *United States v. Bacall*, 443 F.2d 1050, 1056 (9th Cir. 1971); *United States v. Seiffert*, 501 F.2d 974, 982 (5th Cir. 1974).

missing the indictment. Defendant's suggestion was based in large part on the then avowed intention of the United States Attorney's office to use a prosecutor at trial who had heard the compelled testimony.[17] The two Assistant United States Attorneys who participated in the relevant grand jury proceedings have now left the office of the United States Attorney, however.[18] Under these circumstances, I consider it unnecessary to pass upon the troublesome question of whether the federal witness immunity statute protects not only against the introduction of evidence given in compelled testimony and its fruits but also against "non-evidentiary" use.[19]

## IV.

The defendant has also moved for severance of each count in the indictment from each of the others. He argues, first, that the joinder of Count I with Counts II and III is impermissible under

17. To the extent the argument does not rest upon the identity of the prosecutor at trial, I do not share defendant's view of the record and am not prepared to say that the government will not be able to demonstrate that no use will be made of the compelled testimony.

18. The Court assumes that this case has been assigned to a third Assistant United States Attorney. In order to avoid any possible contamination problems, this Opinion will be sealed for the present and copies will be furnished only to defense counsel and the United States Attorney personally. The Court's copies of the transcript of the hearing on the instant motion and the briefs thereon will also be sealed.

19. In *Kastigar*, the contention was made that only "transactional immunity" and not "use immunity" could give protection coextensive with that of the privilege. In this context, the Court examined the practical problems which government access to compelled testimony might pose for a defendant, and the "subtle ways in which the compelled testimony [might] disadvantage a witness." 406 U.S., at 459, 92 S.Ct., at 1664. The Court's response implied that the immunity granted by the statute was adequate to deal with these dangers. *Id.*, at 459–60, 92 S.Ct. 1653. However, when it came to establishing the practical standard for enforcing the statute's protection, the Court stated only that the government would bear the "heavy burden of proving that all of the *evidence it proposes to use* was derived from legitimate sources." *Id.*, at 461–62, 92 S.Ct., at 1665 (emphasis added; footnote omitted). This apparently narrow test, together with the Court's analogy to coerced confession cases (*Id.*, at 461, 92 S.Ct. 1653), could be interpreted as indicating that the statute does not protect against non-evidentiary use. On the other hand, there is probably no prosecutor who would not consider it a substantial benefit to be able to take the pre-trial deposition of a criminal defendant. Allowing similar use to be made of compelled testimony is, accordingly, hard to square with the Court's statements that the statute "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect," and "assur[es] that the compelled testimony can in no way lead to the infliction of criminal penalties." *Id.*, at 453, 461, 92 S.Ct., at 1661, 1665 (emphasis in original). Other courts and commentators have recognized these dangers, and have expressed the opinion that such "non-evidentiary" use should not be permitted. See *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973); *United States v. Dornau*, 359 F.Supp. 684, 687 (S.D.N.Y.1973), *reversed on other grounds*, 491 F.2d 473 (2nd Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974); *Note, supra* n. 3, 82 Yale L.J. 171, 185–6 (1972); *The Supreme Court, 1971 Term*, 86 Harv.L.Rev. 1, 186–87 (1972).

Moreover, a foresighted prosecutor might not wish to press his advantage in this respect. The purpose of an immunity statute is to obtain truthful information, most frequently regarding otherwise undiscoverable offenses. See *Kastigar*, 406 U.S., at 446–47, 92 S.Ct. 1653; *United States v. First Western State Bank of Minot*, 491 F.2d 780, 783 (8th Cir. 1974). This is accomplished by relieving the witness of exposure to the essence of what the Fifth Amendment protects against—"the cruel trilemma of self-accusation, perjury or contempt." *Michigan v. Tucker*, 417 U.S. 433, 437, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). To the extent that a witness is unconvinced that his testimony will not in some way be used against him, the alternatives of perjury or contempt will become more attractive to him, as compared to that of giving truthful, self-incriminating testimony. If this happens, the purpose of the statute will not have been served. An illiberal construction of the immunity statute will thus be self-defeating, and will hinder, rather than help, the cause of effective law enforcement. The Supreme Court has recognized as much, in a closely related context. See *Bronston v. United States*, 409 U.S. 352, 359, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). See also *United States v. Lardieri*, 497 F.2d 317, 320–21 (3rd Cir. 1974).

Federal Rule of Criminal Procedure 8(a). That rule permits joinder if the crimes charged are (1) "of the same or similar character"; or (2) "based on the same act or transaction"; or (3) based "on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

The government does not contend that the second clause of Rule 8(a) applies here. It does argue that the first and third conditions are present. As to the third, it asserts that the acts alleged "evidence a common scheme, the attempts by Henderson to sell his professed influence with county officials to private contractors who are doing business with the county." But this is neither alleged in the indictment nor apparent on the record before me. See *United States v. Quinn*, 365 F.2d 256, 264 (7th Cir. 1966); *cf. United States v. Florio*, 315 F.Supp. 795, 797 (E.D.N.Y.1970). Count I does charge that Henderson offered so to use his influence in return for a sum of money. But neither Count II nor Count III makes any such allegation. Neither of these counts mentions any proposed use of influence, and Count III does not mention the county. Joinder cannot be justified on this basis.

I conclude, however, that joinder is proper because the offenses charged are of "similar character." The indictment alleges that Henderson extorted money from victims associated with the construction business on three occasions between May 1973 and June 1973. Accordingly, I believe that there is sufficient similarity among the three counts to meet the requirements of the rule. See *United States v. Sanders*, 463 F.2d 1086, 1089 (8th Cir. 1972).

The defendant also moves for severance under Federal Rule of Criminal Procedure 14. That rule provides for severance if the defendant would be prejudiced by joinder. The motion is addressed to the sound discretion of the Court. See *United States v. Catena*, 500 F.2d 1319, 1326 (3rd Cir.) *cert. denied*, 419 U.S. 1047, 95 S.Ct. 621, 42 L.Ed.2d 641 (1974). The defendant claims that he would be prejudiced here because the evidence of the other two alleged offenses would not be admissible in separate trials of each count, and thus its admission at a joint trial will lead the jury unfairly to cumulate it against him. See *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964); *United States v. Carter*, 154 U.S.App.D.C. 238, 475 F.2d 349 (1973). The government responds that the evidence on all three charges would be admissible in separate trials, under an exception to the "other crimes rule." I agree that this is so under the exception which permits the admission of evidence tending to show intent.[20] Extortion is a crime which is frequently, if not usually, accomplished by the use of ambiguous communications subject to innocent as well as malicious interpretation. The tone of voice used may be more important than the words said. Physical evidence of the crime is usually not generated. A pattern of such conduct may reveal much more accurately the true significance of the conduct than would an isolated instance. There is some inherent danger that the jury may cumulate the evidence against the defendant when it is presented in this way, but this is not a case where the crime charged or the evidence involved is "apt to arouse irrational hostility" against the defendant, *United States v. Weber*, 437 F.2d 327, 332 (3rd Cir. 1970) *cert. denied*, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971), and the charges are few and simple enough so that the jury, properly instructed, should be able to avoid confusion or misuse. See *Id.; United States v. Lotsch*, 102 F.2d 35 (2nd Cir.) *cert. denied*, 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939). I conclude that severance is not necessary.

An Order will be entered denying defendant's motions.

---

**20.** See *Drew v. United States, supra*, at 90.