UNITED STATES of America, Plaintiff,

v.

Charles F. CORTESE, James David "Dave" Osticco, Charles F. Cortese, Samuel Lovecchio, Defendants.

Crim. A. Nos. 82–00136, 82–00149–01, 82–00149–02 and 82–00151.

United States District Court,
M.D. Pennsylvania.

July 13, 1983.

Eric H. Holder, Jr., and Richard F. Green, U.S. Dept. of Justice, Public Integrity Sec-

tion, Crim. Section, Washington, D.C., for plaintiff.

George E. Clark, Jr., Scranton, Pa., for Cortese.

Thomas Colas Carroll, John Rogers Carroll, Philadelphia, Pa., for Osticco.

Philip T. Medico, Jr., West Pittston, Pa., Anthony B. Panaway, Anthony J. Lupas, Jr., Wilkes-Barre, Pa., for Lovecchio.

## MEMORANDUM

CALDWELL, District Judge.

### I. Introduction and Background

Before the court for disposition are four motions filed in the above-captioned criminal matters. Defendant Osticco has filed a "Substantive Omnibus Pretrial Motion" requesting (1) suppression of electronic surveillance, (2) dismissal of the indictment for indefiniteness and failure to state an offense and for grand jury abuse, and (3) severance of his trial from that of co-defendant Cortese in the matter docketed at Criminal Number 82–00149. Defendant Cortese has filed a motion for suppression and other relief and for dismissal of the indictment in both cases brought against him. Defendant Lovecchio has filed a "Motion to Intervene, Join In And/Or Adopt Defendant Osticco's Motion to Suppress Intercepted Wire and Oral Communications and Derivative Evidence." [1]

On June 27, 1983, a hearing in compliance with our memorandum of June 16, 1983,[2] was held. At that hearing testimony and argument were presented on the outstanding motions, and they are now ripe for disposition. For the reasons discussed hereinafter, the parts of defendant Osticco's motion requesting suppression and dismissal of the indictment are denied and the part requesting severance is dismissed as moot. The suppression motions of defendants

Cortese and Lovecchio are also denied. Defendant Cortese's motion to dismiss the indictments is granted with respect to the case docketed at Criminal No. 82–00149–02 and with respect to Count One only of the case docketed at Criminal No. 82–00136. With respect to the second and third counts, the motion is denied.

### II. Suppression Issues

The suppression motions focus upon the two types of surveillance which led to the indictments in these criminal matters. With regard to Osticco and Cortese, testimony at the recent hearing, as well as documentary evidence, has established that Frank Parlopiano (or Parr) recorded or participated in the interception of conversations he had with each defendant commencing on or about May 13, 1980, and terminating on or about September 23, 1982. These interceptions were made with a microwave recorder carried by Parlopiano and a car recorder installed in his vehicle and were attempted unsuccessfully with a body recorder worn by Parlopiano on one occasion. The other interceptions were conducted at Medico Industries in Plains Township, Pennsylvania, and involved Federal Bureau of Investigation (FBI) installation of devices to intercept telephone and other oral communications. These interceptions began in late December of 1979 pursuant to authorization (18 U.S.C. § 2516) by Chief Judge of the Middle District of Pennsylvania, Hon. William J. Nealon. Judge Nealon also granted one extension of this Title III surveillance.

### A. Consensual Recordings

■ The major focus of our proceeding on June 27, 1983, was the interceptions involving Frank Parlopiano. Our June 16 memorandum had informed the parties that we would be concerned with determining

---

1. Although we could deny this motion because it was filed subsequent to the deadline set for filing motions in these criminal matters, in the interest of justice and expedition we will permit defendant Lovecchio to join in Osticco's suppression motion regarding interceptions made pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *as amended,* 18 U.S.C. §§ 2510 *et seq.*

2. *United States of America v. Cortese, Osticco, and Lovecchio,* 568 F.Supp. 114 (M.D.Pa.1983).

whether the criteria set forth in *United States v. Starks,* 515 F.2d 112 (3d Cir.1975) were satisfied.[3] It had been suggested to us prior to the hearing that the real issue to be developed was that of Parlopiano's consent. Defendants have never seriously contested the other *Starks* criteria, and at the hearing stipulations were entered that affidavits would suffice to establish the capability of the recording devices, the competency of the agents operating them, and the chain of custody of the recordings. Parlopiano testified that he had listened to the tapes introduced as exhibits by the government and that they accurately reflected the conversations in which he participated. Most of these conversations were between Parlopiano and either Osticco or Cortese.

The evidence supporting the voluntariness of Parlopiano's consent was substantial. Both the government and defendant Osticco have drawn our attention to the recent case of *United States v. Kelly,* 708 F.2d 121 (3d Cir.1983) in which the issue of voluntary consent was fully considered. As the *Kelly* case shows, a "totality of the circumstances" test is appropriate in deciding whether official coercion exists which precludes a finding of voluntariness.

At the June 27 hearing Parlopiano testified that he was called in by FBI Special Agent Francis Mulholland in August of 1979 and that, although he initially refused to do any taping because he feared for his safety, in April of 1980 he changed his mind.[4] Asked at the hearing what his motivation was to cooperate he said he just wanted to help. Throughout his testimony Parlopiano stated that he received no threats from the FBI but rather was told that he could cease cooperating at any time. Agent Mulholland's testimony essentially corroborated that of Parlopiano.

As Appendix G to its response to Osticco's motion, the government included fifteen authorizations signed by Parlopiano. Each of the authorizations states, "I have given this written permission to the above-named Special Agents voluntarily and without threats or promises of any kind." Appendix H was the "Memorandum of Agreement" executed between Parlopiano and the government. Embodied in that agreement was at least an implication that Parlopiano might receive payment for his assistance in the investigation.[5] In paragraph 18 of the agreement the government "assume[d] the travel expenses of transporting Frank Parlopiano to a safe destination." According to Parlopiano, the government paid him $16,000 as reimbursement for his expenses while he was cooperating and $10,000 after he was relocated. Parlopiano indicated that the latter sum allowed him to purchase household items and a car so that he could set up residence and find a job at his new destination. Parlopiano's wife received $4,500 to help with car and mortgage payments.

Viewing all of the circumstances surrounding Frank Parlopiano's decision to cooperate in taping the conversations at issue here, we find that Parlopiano was not coerced or threatened or otherwise forced to

---

3. The *Starks* court adopted criteria set forth in *United States v. McKeever,* 169 F.Supp. 426, 430 (S.D.N.Y.1958), wherein the following factual foundation was required before sound recordings were deemed admissible:

　(1) That the recording device was capable of taking the conversation now offered in evidence.
　(2) That the operator of the device was competent to operate the device.
　(3) That the recording is authentic and correct.
　(4) That changes, additions or deletions have not been made in the recording.
　(5) That the recording had been preserved in a manner that is shown to the court.
　(6) That the speakers are identified.

　(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

4. The testimony at our recent hearing indicated that following Special Agent Mulholland's initial contact with Parr in August of 1979 Parr agreed to report back to the FBI on conversations he had with Osticco and Cortese but did not actually participate in recording these communications until May 13, 1980.

5. Paragraph 16 states that "[a]ny payments received by Frank Parlopiano from a representative of the United States Department of Justice for services rendered shall be considered income for tax purposes."

consent. As *Kelly* and other cases indicate, the fact that an individual may receive payments or other benefits as a result of his cooperation does not render the consent involuntary. For all of the foregoing reasons, we conclude that the *Starks* criteria have been met and that the consensual recordings made with the cooperation of Frank Parlopiano will not be suppressed.

## B. Title III Interceptions

The other type of electronic surveillance, the Title III interceptions conducted in these matters, has been subjected to a threefold attack by defendant Osticco. First, defendant alleges that the authorization orders were improperly executed because the FBI failed to minimize the interception of nonpertinent conversations. Second, Osticco asserts the existence of alleged insufficiencies in Special Agent Dennis Sackreiter's affidavit of December 21, 1979, in support of the initial authorization by Judge Nealon to intercept wire and oral communications at Medico Industries, Inc. Last, Sackreiter's affidavit of January 25, 1980, is attacked as insufficient to support an extension of the electronic surveillance.

### 1. The Minimization Issue

■ Defendant Osticco has raised the issue that all of the Title III electronic surveillance must be suppressed because the law enforcement agents involved did not minimize the interception of non-pertinent conversations, as required under 18 U.S.C. § 2518(5).[6] As Osticco recognizes, however, the applicable standard is an objective evaluation of whether the conduct of the government official was proper under the circumstances. In *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), a case in which no minimization was attempted, the court discussed the proper standard and concluded,

> The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the

surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

*Id.* at 140, 98 S.Ct. at 1724, 56 L.Ed.2d at 179. The court continued by recognizing that the question of the motive or intent of the agent need play no major role in a minimization inquiry and listed several relevant factors to be utilized. Among them were percentage of nonpertinent calls. Yet the Court stated,

> Such percentages may provide assistance, but there are surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable. The reasons for this may be many. Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination.

*Id.*

Turning to the matter before us, we note initially the inclusion by the government in Appendix C of its response to Osticco's motion of several memoranda regarding minimization. Special Agents of the FBI who received training regarding minimization of the electronic surveillance were required to initial these memoranda. Moreover, the monitoring agents were required to read the application, affidavit, and authorization order for the interceptions, the latter of which, *see* n. 7 *infra,* contained a minimization directive. Additionally, Judge Nealon actively supervised the course of the interceptions by requiring reports at five day intervals, which reports were included in

---

**6.** The statutory section provides in relevant part:

> Every order and extension thereof ... shall be conducted in such a way as to minimize the interception of communications not oth-

erwise subject to interception under this chapter ....

Both the initial authorization and the extension orders in the present matter contains provisions requiring minimization.

Appendix D of the government's response.[7] Of further import to the minimization issue is Appendix E of the government's response, which includes the affidavit of Special Agent Robert Grispino. Grispino reviewed the logs detailing the telephone interceptions and found that of 11,711 interceptions, 10,836 were minimized for a minimization quota of 93 per cent. The government has indicated that 585 microphone interceptions were made and that minimization was also effected with regard to those communications.

Citing numerous authorities including *Scott,* the court in the recent case of *United States v. Dorfman,* 542 F.Supp. 345 (N.D.Ill. 1982) concluded,

> The term minimization is a shorthand expression which represents the government's obligation to reduce to the extent possible interception of conversations which are not the subject of the court order. Minimization is to be judged on a case by case analysis of the reasonableness of the government's conduct in terminating non-pertinent conversations. [citations and footnote omitted]. The reasonableness approach reconciles the frequently difficult task of determining the character of an intercepted conversation with the statutory policy of minimizing any intrusion on personal privacy.... Absent an "unreasonable" intrusion, neither the statute nor the fourth amendment are violated. [citations omitted].

*Id.* at 390. Moreover, as the court pointed out,

> It is not enough for the defendants to identify particular calls which they contend should not have been intercepted; they must establish a pattern of intercep-

tion of innocent conversations which developed over the period of the wiretap. *Id.* at 391.

▮ In the present case, defendant Osticco has stated that he seeks to put the government to its burden because after looking at logs and listening to intercepted conversations, he feels minimization efforts were "haphazard at best." Our review of applicable authorities and the minimization materials submitted by the government compels a contrary conclusion. The government minimized interceptions in the present investigation by ceasing to monitor non-pertinent conversations before they concluded. Because of the rather extensive documentation the government has submitted in the face of defendant's generalized attack, we find the motion may properly be disposed of without a hearing. Accordingly, we conclude that the electronic surveillance conducted by the government was adequately minimized and will not be suppressed on fourth amendment or statutory grounds for lack of minimization.

## 2. The December 21, 1979, Initial Affidavit

Special Agent Sackreiter's December 21 affidavit, included in Appendix A of the government's response to Osticco's motion, indicates that Osticco and several other named individuals were believed to be involved in interstate transportation of stolen property, a violation of 18 U.S.C. §§ 2314 and 2315. These offenses are among those enumerated in 18 U.S.C. § 2516(1)(c) as ones for which electronic surveillance authorization may be sought to gather evidence. As 18 U.S.C. § 2518(3) indicates, a judge faced with an application to permit oral and wire interceptions must make certain determinations from the facts submitted.[8] The main thrust of Osticco's at-

---

**7.** The submission of these reports is controlled by 18 U.S.C. § 2518(6), which provides,

> Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall

be made at such intervals as the judge may require.

**8.** The statutory section states,

> Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on

tack appears to be on the section of Sackreiter's affidavit addressing probable cause to believe a crime was being, had been, or was about to be committed and specifically on the hearsay declarations of three confidential informants.

As we are well aware, the landmark cases of *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) established a two-pronged test dealing with hearsay allegations. Under the aegis of those decisions and their progeny, courts have required affidavits to reveal how the source learned the information he provided and to show that the source was reliable or that the information was reliable in the particular matter. In fact, the *Spinelli* majority specifically rejected the "totality of circumstances" test adopted by the United States Court of Appeals for the Eighth Circuit and said that it "paints too broad a brush." 393 U.S. at 415, 89 S.Ct. at 588, 21 L.Ed.2d at 643. Recently, however, the Supreme Court has adopted a "totality of circumstances" analysis in *Illinois v. Gates,* ––– U.S. –––, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), a decision addressed specifically to the applicability of the fourth amendment to a search warrant issued on the basis of a partly corroborated anonymous informant's tip. The majority opinion in *Gates* noted that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at –––, 103 S.Ct. at 2328. The court continued by stating,

Moreover, the "two-pronged test" directs analysis into two largely independent channels—the informant's "veraci-

ty" or "reliability" and his "basis of knowledge." ... There are persuasive arguments against according these two elements such independent status. Instead, they are better understood as relevant considerations in the totality of circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability. See, *e.g., Adams v. Williams, supra,* 407 U.S. [143] at 146–147 [92 S.Ct. 1921, at 1923–24, 32 L.Ed.2d 612]; *United States v. Harris,* 403 U.S. 573 [91 S.Ct. 2075, 29 L.Ed.2d 723] (1971).

If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip. See *United States v. Sellers,* 483 F.2d 37 (CA5 1973). [footnote omitted] Likewise, if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary. *Adams v. Williams, supra.* Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case. Unlike a totality of circumstances analysis, which permits a balanced assessment

the basis of the facts submitted by the applicant that—

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip, the "two-pronged test" has encouraged an excessively technical dissection of informants' tips, [footnote omitted] with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate. *Id.* —— U.S. at ——, 103 S.Ct. at 2329–30.

The above-quoted language vividly illustrates the majority's disenchantment with the rigorous standards read into the *Aguilar* and *Spinelli* decisions. *See also id.* at —— nn. 9 & 10, 103 S.Ct. at 2330–31 nn. 9 & 10. The government in the present matter has urged that *Gates* should be applied retroactively but has left that issue to our discretion. We feel that we do not have to reach the retroactivity question for two reasons: first, because the *Gates* majority indicates that *Aguilar* and *Spinelli,* when properly read, would be in line with the *Gates* holding and second, because even if the more rigid interpretations of the *Aguilar* and *Spinelli* criteria are applied to the affidavit in the present matter, it was nevertheless sufficient to establish probable cause.

■ Defendant Osticco's attack is based largely on quoting from isolated sections of the affidavit. Scrutiny of the affidavit as a whole, however, shows that a finding of probable cause was amply supported through three confidential informants. The first confidential informant [hereinafter CI–1] had worked with the FBI for three years and though information furnished by him had been checked at least ten times it had never proven false. For more than five years, CI–1 had known Osticco and other subjects of the investigation, had personally observed Osticco engaged in selling diamonds and jewelry from his office at Medico Industries, Inc., and had overheard numerous discussions dealing with these sales. Furthermore, he had been advised to be cautious in what he said during phone conversations with defendant and had overheard Osticco give instructions that jewelry purchased from him was not to be worn in public and should be placed in a safety deposit box for several years. Moreover, CI–1 knew that the prices charged for the jewelry were far below even wholesale prices for such items. The second confidential informant [hereinafter CI–2] had essentially the same history of reliability and cooperation with the government. CI–2 had also furnished information leading to at least six convictions and at least seven orders for electronic surveillance, which surveillance corroborated the information he had provided. Though CI–2 did acknowledge that Osticco purchased and sold legitimate jewelry, the informant stated from his direct contact with Osticco that defendant bought and sold various stolen property, was regarded as a "selective fence," and had told CI–2 that unmounted diamonds could not be identified nor traced. These allegations, coupled with the ones defendant Osticco has singled out, more than suffice to show CI–2's veracity, reliability, and basis of knowledge. We reach the same conclusions with regard to the third confidential informant [hereinafter CI–3], who had been providing information to the FBI for more than one year and whose information, during numerous checks, had never proven false. CI–3's statements, though not as incriminatory of Osticco's activities as the allegations of the other two informants, nevertheless support the conclusion that Osticco's dealings were in stolen jewelry. We agree with Osticco that taken alone CI–3's averments would be insufficient to establish probable cause for the authorization of electronic surveillance. However, the law is well-established that one confidential informant may support a finding of probable cause, and we find that CI–1 and CI–2 fully met the probable cause requirements of the strictest reading of the *Aguilar/Spinelli* test and therefore also satisfied the "totality of circumstances" analysis espoused by *Gates.* Accordingly, the oral and wire communications intercepted as a result of the initial authorization order of December, 1979, will not be suppressed.

*3. The January 25, 1980, Extension Affidavit*

■ Special Agent Sackreiter executed a second affidavit on January 25, 1980, which

was incorporated in the application to Judge Nealon for an extension of the initial surveillance. This affidavit and the application based thereon expanded the scope of the interceptions to include communications involving jury tampering and obstruction of a criminal investigation. Defendant Osticco has attacked this second affidavit as insufficient to show probable cause and as containing substantial misrepresentations. We find that Osticco's position is unpersuasive. The January affidavit incorporates the December one and when read with the information in the December affidavit substantiates a finding that the communications dealt with stolen jewelry. Moreover, as we have already noted, although Osticco was known to deal in legitimate jewelry, he also had a reputation as one who "fenced" stolen property. We disagree with Osticco's position that the intercepted conversations quoted in the affidavit were as consistent with legitimate, as well as with stolen jewelry, dealings. Probable cause to conclude that criminal activity is afoot, as many cases have noted, does not mean proof beyond a reasonable doubt. Rather, as the Court in *Gates, supra,* stated,

> [P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause .... In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.

—— U.S. at —— n. 13, 103 S.Ct. at 2335 n. 13. Cryptic language and discussion of sales at below normal prices bolster the conclusion that what on the face might be "innocent" jewelry sales in all probability were dealings in stolen property.

The second aspect of defendant Osticco's attack refers to the portion of the affidavit addressing jury tampering. Essentially the affidavit attacks the use of intercepted conversations to which Frank Parr was a party without disclosing to Judge Nealon Parr's status as an informant. Osticco neglects the following important paragraph in the affidavit, however, which paragraph does not deal with Frank Parr.

> On January 10, 1980, an oral conversation [was intercepted] between JAMES DAVID OSTICCO and CASPER GUIMENTO in which they are overheard discussing their concern that CHARLES CORTESE, the ex-husband of ROSEANN CORTESE, may be given immunity in connection with the jury tampering investigation. They also state that they will have to get money for his (CORTESE'S) lawyer. OSTICCO is overheard telling WILLIAM D'ELIA that D'ELIA won't be around much longer because they are giving CHARLES CORTESE immunity.

Contrary to defendant's position, the Osticco/Parr conversations were not the sole ones dealing with jury tampering. The January 10 conversation to which Parr was not a party amply supported the conclusion that Osticco feared what information Cortese might reveal to the grand jury. Moreover, the government has informed defendant's counsel and this writer that Judge Nealon, although not specifically told that Frank Parr was an informant, was advised that one of the three confidential sources listed in the December affidavit was the same party intercepted and named in the January affidavit. Furthermore, we believe the government is correct in its position that since Judge Nealon was concerned with continued interception of Osticco, that his focus would naturally be on what Osticco said during the communications outlined in the affidavit.

Defendant Osticco also takes issue with the government's representation that interceptions were needed because confidential informants could not penetrate the highest levels of the criminal enterprise being investigated. Obviously, confidential informants were able to gather some information as Sackreiter's December 21 affidavit clearly states. Moreover, as Parr testi-

fied, he had known Osticco for ten years, and thus we cannot say that he "penetrated" a tightly knit organization. Additionally, there is nothing to suggest that Parr could have gotten access to the total organization as defined in the December affidavit. The logical meaning of the language in the affidavit is that newcomers could not infiltrate and that others, such as Parr, could not gain entry into the small, exclusive group of highest level individuals.

■ Finally, with regard to the affidavit's description of the January 11, 1980, conversation between Osticco and Parr, Osticco claims that the affidavit misrepresented that Osticco "lets his guard down" or "expresses concern that he will be implicated." We have read the transcript of the conversation itself (Appendix B of the government's response) and concede that while the portion of the affidavit dealing with Osticco "letting his guard down" is perhaps a gratuitous subjective comment, the rather extensive discussions of Cortese's ex-wife and how to impeach her testimony (or have her charged with perjury) certainly indicate a grave concern by Osticco of the consequences of any revelations she might make. In accordance with the foregoing discussion, we find that information gathered pursuant to the Title III extension order need not be suppressed.

### III. Indefiniteness of the Indictment and Its Failure to State an Offense

Defendant Osticco's omnibus motion also has urged dismissal of the indictment returned against him on the ground that it is indefinite and fails to state an offense. According to defendant, the behavior for which he is charged with corruptly participating as part of the jury tampering/obstruction of justice conspiracy with defendant Cortese amounts only to Osticco's paying Cortese's legal and other expenses, urging Cortese to invoke his fifth amendment privilege when Cortese was called to testify before a federal grand jury, and allegedly instructing Cortese to "lie if he had to" when Cortese subsequently ap-

peared to testify on March 7, 1980, under a grant of immunity.

■ Defendant's contention regarding payment of legal fees is that the allegation of paragraph 10 of Count One of the indictment is so indefinite that defendant Osticco cannot defend against it. That paragraph states that money given to Cortese at Osticco's direction on six occasions for "legal and other expenses" was "to prevent the defendant CHARLES F. CORTESE from giving truthful information to the grand jury." It is obvious that the indictment suffices to advise Osticco that he is charged with paying Cortese's legal fees in return for Cortese's failure to testify truthfully before the grand jury and not out of concern that Cortese might not have counsel.

■ The same line of reasoning applies with regard to Cortese's refusal to testify on fifth amendment grounds. When Cortese appeared before the grand jury on January 3, 1980, he did invoke his privilege and Osticco has presented the rather novel argument that even if Osticco had a corrupt motive in urging Cortese's refusal to testify, the indictment is framed to indicate that both Osticco and Cortese had an interest in preventing the grand jury from learning defendants' involvement in the jury tampering. Thus, argues Osticco, Cortese was pleading the fifth amendment for his own protection as much as Osticco's and the government may not penetrate a witness's own motives for refusing to provide testimony before a grand jury. We are not surprised that defendant has cited no case law in support of this argument, as we feel that sound jurisprudence would preclude acceptance of such a position.

In the present matter, Osticco's concern was with testimony Cortese might give to implicate Osticco. The case of *United States v. Cioffi*, 493 F.2d 1111 (2d Cir.), cert. denied, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974), cited by both defendant and the government, provides important guidance on the proper disposition of the issue before us. In *Cioffi* a conviction of conspiracy to obstruct justice and obstruction of justice was upheld against numerous

attacks including one similar to that raised by Osticco. In addressing the issue, the *Cioffi* court noted,

> Cioffi insists that the mere giving of advice to a witness to plead his constitutional privilege against self-incrimination cannot be made a crime. But here we have something more than "mere" advice. The correct view as charged by Judge Motley, and as held by the Ninth Circuit in *Cole v. United States,* 329 F.2d 437 (9th Cir.), cert. denied, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964), is:
>
> > I charge you that while a witness violates no law by claiming the Fifth Amendment privilege against self-incrimination in a grand jury, one who bribes, threatens, coerces a witness to claim it or advises with corrupt motive a witness to take it, can and does obstruct or influence the administration of justice.
>
> The focus is on the intent or motive of the party charged as an inducer. The lawful behavior of the person invoking the Amendment cannot be used to protect the criminal behavior of the inducer....

*Id.* at 1119.

We agree with the government that the fifth amendment privilege is a personal one and that if a co-conspirator can be shown by bribes, threats, or corrupt motive to have induced his ally to invoke the privilege, the co-conspirator may be prosecuted for his role. In summary, we find that the indictment amply alleges the existence of Osticco's corruptly conspiring with Cortese to shield Osticco.

Finally, defendant attacks paragraph 11 of Count One regarding Osticco's alleged instruction to Cortese to "lie if he had to" during his second grand jury appearance. We recognize that the law is unsettled with regard to whether inducing someone to commit perjury constitutes obstruction of justice under 18 U.S.C. § 1503. As both defendant and the government recognize, relatively recent decisions of the

United States Court of Appeals for the Fifth Circuit espouse the view that perjury and subornation of perjury are properly with the scope of the statute. *See United States v. Griffin,* 589 F.2d 200 (5th Cir. 1979); *United States v. Partin,* 552 F.2d 621 (5th Cir.1977). As the *Partin* court noted, endeavoring to induce one to commit perjury may be charged under the specific language of the beginning clauses of 18 U.S.C. § 1503 or under the broader "due administration" clause.[9] *Id.* at 631. Because we find the rationale of these cases persuasive, we hold that this portion of the indictment dealing with Osticco's advice to Cortese to testify falsely is properly charged under 18 U.S.C. § 1503. In accordance with our foregoing discussion, the part of Osticco's omnibus motion requesting dismissal of the indictment is denied.

### IV. Grand Jury Abuse

The next issue raised in defendant Osticco's motion contests the use of summary or hearsay evidence before the grand jury that returned the indictment. In *United States v. Lovecchio,* 561 F.Supp. 221 (M.D.Pa.1983), we considered and denied several motions, including defendant Lovecchio's request to inspect grand jury minutes on the ground that the indictment was based on hearsay. Rather than repeat our entire prior discussion, we refer to page 232 of our memorandum in *Lovecchio.* In that decision, we noted the "doubtful validity" in our circuit of the rule formulated by the United States Court of Appeals for the Second Circuit in *United States v. Estepa,* 471 F.2d 1132 (2d Cir.1972) and summarized as follows in *United States v. Cruz,* 478 F.2d 408, 410 (5th Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973):

> [A]n indictment based on hearsay is invalid where (1) non-hearsay evidence is readily available; (2) the grand jury is misled into believing it was hearing direct testimony rather than hearsay; and

---

**9.** The "due administration" clause provides in relevant part that whoever "corruptly ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede the due administration of justice" may be convicted of obstruction of justice.

(3) there is a high probability that had the grand jury heard the eye witnesses it would not have indicted.

Assuming arguendo, however, that the *Estepa* rule should be applied, we nevertheless conclude that the indictment in the present matter is valid. Even were we to concede that direct evidence was readily available (presumedly from Frank Parlopiano), we find that defendant cannot establish that the other two requirements of the tripartite rule have been met. Defendant himself recognizes that the grand jury was unlikely to have thought that the FBI agents who gave testimony were giving direct evidence. Rather the government has indicated that the indicting grand jury[10] had read to it complete rather than summarized statements Frank Parlopiano made to agents and that the grand jurors were informed that these were hearsay declarations.

Defendant's point with regard to the third prong of the *Estepa* test requires little discussion. As the government has pointed out, any possibility that grand jurors would not have indicted had they heard eyewitnesses, particularly Parlopiano, is remote. In fact, the indicting grand jury heard testimony from Roseanne Donahue, whose ex-husband, defendant Cortese, was subsequently indicted for his role in influencing or endeavoring to influence her to be the lone holdout juror for acquittal in a federal criminal trial. Parlopiano, though not present, was heard by the grand jury through his taped conversations with Cortese and Osticco. Accordingly, we conclude that the grand jury process was not abused, even under *Estepa* criteria, and the indictment against defendant Osticco is therefore valid.

## V. Severance

■ The final section of Osticco's omnibus motion deals with severance of his trial from that of co-defendant Cortese in the matter docketed at CR 82–00149. Because of our disposition of defendant Cortese's motion to dismiss the indictment against him, discussed at VI. *infra,* this aspect of Osticco's motion is dismissed as moot.

## VI. Use of Immunized Testimony

We now address defendant Cortese's motion to dismiss the indictments against him on the ground that the government improperly presented to the indicting grand jury immunized testimony that defendant had given to a prior grand jury. *See* n. 10 *supra.* In January, 1980, when Cortese was initially called to testify he invoked his fifth amendment privilege on the advice of counsel. He was subsequently granted immunity and testified before the same grand jury on March 7, 1980, but denied having any knowledge of the matters about which he was questioned.

On October 1, 1982, the third grand jury involved in the obstruction of justice investigation indicted Cortese for jury tampering (18 U.S.C. § 1503), and for two counts of giving false declarations (18 U.S.C. § 1623) in connection with his testimony given to the grand jury under the grant of immunity. There is no dispute that in the course of presenting its evidence to the indicting grand jury that the government read the defendant's immunized testimony from March 7, 1980. Subsequently, on October 19, 1982, the same grand jury also indicted the defendant for engaging in a conspiracy with Osticco to obstruct justice (18 U.S.C. § 371) in connection with the jury tampering investigation.

Defendant's grant of immunity was given under 18 U.S.C. § 6002, which restricts the subsequent use that can be made of compelled testimony. The act prohibits future

**10.** The record reflects that a total of three grand juries were involved. Between November of 1979 and June of 1980, the first grand jury met and on March 7, 1980, heard the immunized testimony of defendant Cortese. The second grand jury, which met from July, 1981, to March, 1982, had read to it the transcripts from the prior proceedings. The third grand jury, which met from June, 1982, through October, 1982, returned the indictments against defendants Osticco, Cortese, and Lovecchio. Transcripts from the two prior proceedings were read to this grand jury, which also heard testimony from Lovecchio.

reference to the testimony in the following terms:

[No] testimony or other information compelled under the order [granting immunity] ... may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

There is no doubt under the facts outlined that the government was permitted to refer to the immunized testimony to secure the perjury indictment, and such use is clearly excepted from the prohibitions in the statute. Cortese contends, however, that the other charges returned by the grand jury must be dismissed because his immunized testimony was used in violation of the terms of the statute, and hence in violation of his constitutional rights under the fifth amendment. After a careful analysis of the statute and the cases interpreting it we are led to conclude that the use of defendant's immunized testimony was improper under the circumstances.

The landmark case of *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) addressed the scope of the immunity granted under 18 U.S.C. §§ 6002–6003, and held that the statutory immunity was co-extensive with the scope of the fifth amendment privilege against self-incrimination. Stating that "a grant of immunity must afford protection commensurate with that afforded by the privilege," the court ruled that "[i]mmunity from the use of compelled testimony ... affords this protection.... [and] prohibits the prosecutorial authorities from using the compelled testimony in *any* respect...." *Id.* at 453, 92 S.Ct. at 1661, 32 L.Ed.2d at 222.

The United States Court of Appeals for the Second Circuit has had two occasions to declare that indictments for substantive offenses are defective when rendered by grand juries which have heard immunized testimony given by the defendant. In *United States v. Anzalone,* 555 F.2d 317 (2d Cir.1977), the court reversed convictions for substantive offenses where the same grand jury that indicted defendant had heard immunized testimony from him. The same result had been reached in *United States v. Hinton,* 543 F.2d 1002 (2d Cir.1976) where the court reversed a conviction in similar circumstances, i.e. indictment on substantive charges being investigated by a grand jury following receipt of immunized testimony.

The government acknowledges the restrictions contained in the statute, as interpreted in *Kastigar, supra,* but seeks to distinguish the procedure used in this instance. The government argues that it was impossible for the grand jury to have improperly relied upon or used defendant's immunized testimony because it was wholly exculpatory. Unfortunately, however, the immunity statute does not attempt to distinguish between exculpatory and incriminatory testimony, but rather provides that the use of immunized testimony is restricted to certain enumerated situations. The same argument the government now makes was made and rejected in *Hinton, supra,* where the court said,

Even if Hinton in her testimony before the grand jury substantially denied any involvement in the conspiracy, that denial does not preclude the possibility of improper use against her of her testimony. A juror can draw an inference of a witness's guilt from either a confirmation of, or a denial of participation in, acts about which he is questioned....

\* \* \* \* \* \*

We believe that as a matter of fundamental fairness, a Government practice of using the same grand jury that heard the immunized testimony of a witness to indict him after he testifies, charging him with criminal participation in the matters being studied by the grand jury, cannot be countenanced....

*Id.* at 1009–10. *See also United States v. Anzalone,* 555 F.2d 317 (2d Cir.1977).

In this case it is clear that whether the content of Cortese's grand jury testimony is labelled incriminatory or exculpatory is immaterial. The grand jury specifically referred to this testimony in both indict-

ments, and stated that the defendant had testified falsely on March 7, 1980. Obviously, the indictments for the substantive offenses were infected in a legal sense, if not in fact, by the finding of the grand jurors that Cortese had not been truthful in his appearance before the previous grand jury. Should it be suggested that a hearing be convened to determine if the jurors were improperly influenced by the immune testimony, we need only refer to the eloquent disposition of this argument made in *Hinton, supra,* 543 F.2d at 1009–10:

> We are convinced that such a hearing on the question of taint would not suffice. Beyond the foreseeable difficulties of establishing at a hearing that the grand jurors, when they decided to indict, did not improperly use the immunized testimony or leads or evidence derived from it, for us to condone the practice of having the same grand jury that heard the immunized testimony indict the witness who so testified is to invite action where the cure is worse than the malady. The prospect of peering into the grand jurors' minds, or of examining them individually, to ascertain whether ... testimony was improperly used, is both impractical and unpalatable.

■ Having determined that defendant's immunized grand jury testimony was improperly presented to the indicting grand jury the question arises as to the proper disposition to be made at this point in the proceeding. Where a defendant asserts that there was direct or derivative use of his grand jury testimony by the prosecution, courts have required that this be raised by way of defense. *See, e.g., Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *United States v. Henderson,* 406 F.Supp. 417 (D.Delaware 1975). However, such cases do not involve a flagrant violation of the immunity statute, i.e., the direct use of the immunized testimony before the indicting grand jury. The court in *Hinton, supra,* although considering the matter post-conviction, found the practice outside the bounds of permissible prosecutorial conduct and held that such indictments are invalid. Although in this case it is true

that Cortese did not appear and testify before the indicting grand jury, and that his previous grand jury testimony was read to them, we fail to see this as any basis for distinction, particularly where the indicting grand jury concludes that the testimony presented to it is untrue.

For the foregoing reasons, the indictment docketed at Criminal Number 82–00149–02 and Count One of the indictment docketed at Criminal Number 82–00136 will be dismissed. It is unfortunate that charges so serious must be dismissed on legal grounds rather than on merit. This result might have been avoided in several ways. One would have been to indict the defendant on the substantive charges first, before the perjury charge was pursued and before the immune testimony was presented. Another alternative would have been to employ different indicting grand juries. Although not as convenient as the procedure used, the defendant's fifth amendment rights could have been protected at the same time the interests of society were being satisfied.

## VII. The Entrapment Defense

With respect to the perjury counts of the indictment docketed at Criminal Number 82–00136, the defendant Cortese also raises what he has termed "in a sense a defense based upon entrapment." His argument is that Frank Parr, as agent of the government, acting on government instructions, developed a relationship of trust and confidence with Cortese so that incriminating statements could be taped by Parr. Parr, as a messenger for Osticco, then advised Cortese to "lie if he had to" when testifying before the grand jury on March 7, 1980. Since the information about which Cortese was questioned before the grand jury was already within the government's knowledge, the only purpose to be served by questioning Cortese about his conversations with Parr, Cortese argues, was to elicit perjured testimony. Thus, Cortese argues, the whole sequence of events amounts "in a sense" to entrapment.

■ We agree with the government that the proper inquiry with respect to the entrapment defense must focus on the predisposition of the defendant to commit the crime rather than on the conduct of the government. *United States v. Russell,* 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366, 371 (1973). Entrapment occurs when a defendant who was not predisposed to commit the crime does so as a result of the government's inducement. *United States v. Jannotti,* 673 F.2d 578, 597 (3d Cir.1982). Typically, the entrapment defense is a jury question, and it may therefore not be decided in the context of the instant motion to dismiss. *Id.,* and cases cited therein.[11] We will therefore deny the defendant's motion to dismiss the indictment.

We note further that the defense of entrapment requires an admission by the defendant of the presence of the elements of the crime with which he is charged. *United States v. Levin,* 606 F.2d 47, 48 (3d Cir. 1979); *United States v. Watson,* 489 F.2d 504, 507 (3d Cir.1973). From the manner in which Cortese has asserted the defense, we cannot say that the case is yet in the required posture, nor, indeed, because of the qualifying language used, can we even be sure that the defense the defendant intends to pursue is precisely one of entrapment. This uncertainty understandably puts the government in an uncomfortable position since it bears the burden of proving beyond a reasonable doubt that an entrapment did not occur, once the defense is raised. As the court in *Levin* stated:

> We conclude that it would impair the effectiveness of the adversarial process to permit a criminal defendant to allude to a theory of entrapment ... without putting the government on notice so that it can meet its burden of proving that the defendant was not entrapped. Therefore, we hold that a defendant is not entitled to an instruction on entrapment unless he explicitly pleads, at a sufficiently early point in the trial, that he was entrapped.

606 F.2d at 49. The instant motion has given the government at least some advance notice that the entrapment defense may be raised. If the defendant plans to pursue this line of defense, however, we would expect him to notify the government and expressly plead it as part of his case in chief so that the government will have an opportunity to meet the issue squarely and meet its burden of proof.

An appropriate order will be entered.

## ORDER

AND NOW, this 13th day of July, 1983, IT IS HEREBY ORDERED THAT:

1. Defendant Osticco's "Substantive Omnibus Pretrial Motion" is disposed of as follows:

   a. Defendant's motion joined in by defendant Lovecchio, for suppression of the electronic surveillance evidence is denied.

   b. Defendant's motion for dismissal of the indictment is denied.

   c. Defendant's motion for severance is dismissed as moot.

2. Defendant Cortese's suppression motion is denied.

3. Defendant Cortese's motion for dismissal of the indictments is granted to the following extent:

   a. The indictment docketed at Criminal Number 82–00149–02 is dismissed.

   b. Count One only of the indictment docketed at Criminal Number 82–00136 is dismissed.

---

**11.** There have been instances where the entrapment defense is established as a matter of law on the basis of the undisputed facts, *See, e.g., Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). This is not such a case.