**UNITED STATES of America**

**v.**

**John M. POINDEXTER.**

**Crim. No. 88–0080–01 (HHG).**

United States District Court, District of Columbia.

Dec. 19, 1989.

---

Lawrence E. Walsh, Independent Counsel and Michael Bromwich, Special Counsel, John Q. Barrett, Robert C. Longstreth, Associate Counsel, Office of the Independent Counsel, Washington, D.C., for the U.S.

Richard W. Beckler, Joseph T. Small, Jr., Stephen M. McNabb, Frederick Robinson and Michael G. McGovern, Fulbright & Jaworski, Washington, D.C., for defendant John M. Poindexter.

## OPINION

HAROLD H. GREENE, District Judge.

The issue before the Court is whether it should dismiss the indictment on account of what defendant claims to be the government's failure to comply with the require-ments of *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

## I

### *Factual Background*

In the spring of 1987, defendant was subpoenaed to testify and to provide documents to the congressional committees investigating the so-called Iran-contra affair. Prior to that time, the Office of Independent Counsel had convened a grand jury which was investigating the same subject in a criminal context. When called by the congressional bodies, defendant asserted his Fifth Amendment privilege against self-incrimination. Upon application by the congressional committees, the District Court issued orders compelling defendant to testify, at the same time granting him what is called "use immunity" with respect to that testimony. 18 U.S.C. § 6002. In compliance with these orders, defendant testified for several days before the committees in executive session and for several more days in public. The public sessions were widely broadcast and televised, and they were the subject of extensive coverage in the print media.

Following his indictment here, defendant, together with two of his co-defendants who had also received immunity—Oliver North and Albert Hakim—requested that Judge Gesell of this Court, who was then presiding over all the Iran-contra cases, dismiss the indictment pursuant to *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Ultimately, as discussed below, that request was denied, and it has now been renewed to this Court.

In *Kastigar,* the Supreme Court was faced with the issue whether an individual may be compelled over his objection to give testimony, consistently with the Fifth Amendment's privilege against self-incrimination, when the government provides him with use immunity pursuant to 18 U.S.C. § 6002. The Court answered that question in the affirmative, but in so doing it held that, to be effective, the immunity grant must prohibit the prosecutorial authorities

from using the compelled testimony in any respect. In that vein, the Court ruled that the prohibition on use includes use of the compelled testimony as an investigatory lead and of evidence obtained by focusing investigation on the immunized witness as a result of compelled disclosures. However, said the Supreme Court, neither the Fifth Amendment nor the immunity statute precludes the government from prosecuting such a witness by the use of evidence from independent sources.

When the *Kastigar* issue was first raised before Judge Gesell by the defendants, including Poindexter, he held an evidentiary hearing, at which Lawrence Walsh, the Independent Counsel appointed with respect to these cases, testified regarding the precautions he had taken to prevent exposure of the attorneys on his staff to the congressional testimony of Poindexter, North, and Hakim—the three Iran-contra defendants who had been granted immunity.[1] Judge Gesell also reviewed the entire transcript of the grand jury proceedings that led to the indictment of these persons in order to determine whether impermissible use had been made of the immunized testimony by and before that body; he reviewed related documents; and he ordered a severance of the defendants based in part on the possibility that a defendant might want to make use at trial of the immunized testimony of a co-defendant. On June 16, 1988, the Judge issued a thoughtful and comprehensive Opinion, detailed findings, and an order that denied defendants' motion to dismiss on *Kastigar* grounds. *United States v. Poindexter*, 698 F.Supp. 300 (D.D.C. 1988).[2]

On August 25, 1989, defendant Poindexter filed with this Court a "Renewed Motion to Dismiss" on *Kastigar* grounds. After briefing by both parties of the issue, and after hearing legal argument, this Court ordered that two evidentiary hearings be held. At one of these, testimony was taken from the two members of the Independent Counsel's professional staff who had not been exposed to the early prophylactic measures adopted by the Independent Counsel, and at the other, testimony was heard from five prospective trial witnesses.[3] *See* Parts IV and V, *infra*. The motion is now ripe for decision.

## II

### Legal Principles

As will be seen below, the decisions which have interpreted and applied *Kastigar* are by no means unanimous in their approach to the immunity problem. In that circumstance, to the extent that this Court is not bound by precedent (*i.e.*, decisions from the Court of Appeals for this Circuit), it is useful to consider general jurisprudential principles as guideposts for decision.

What is most basically at stake here is the defendant's right under the Fifth Amendment not to be required to incriminate himself, that is, not to testify at all.

---

**1.** Judge Gesell summarized these precautions as follows:

Prosecuting personnel were sealed off from exposure to the immunized testimony itself and publicity concerning it. Daily newspaper clippings and transcripts of testimony before the Select Committees were redacted by non-prosecuting "tainted" personnel to avoid direct and explicit references to immunized testimony. Prosecutors, and those immediately associated with them, were confined to reading these redacted materials. In addition, they were instructed to shut off television or radio broadcasts that even approached discussion of the immunized testimony. A conscientious effort to comply with these instructions was made and they were apparently quite successful. In order to monitor the matter, all inadvertent exposures were to be reported for review of their possible signifi-

cance by an attorney ... who played no other role in the prosecution after the immunized testimony started ... Overall the file reflects a scrupulous awareness of the strictures against exposure and a conscientious attempt to avoid even the most remote possibility of taint.

*United States v. Poindexter*, 698 F.Supp. 300, 312–13 (D.D.C.1988).

**2.** Following the conclusion of the trial of Oliver North, Judge Gesell again denied a *Kastigar* motion to dismiss filed by that defendant.

**3.** In advance of these hearings, the Court also approved subpoenas issued by the defense for various documents in the possession of the Independent Counsel bearing upon possible taint from the immunized testimony.

This means, of course, that when he is compelled, following the grant of use immunity, to testify against his will, the immunity must be broad enough to make him whole—to place him in the same position as if he had never testified. The practical effect of such an assumption is that any subsequent criminal prosecution must proceed without evidence that is based on testimony defendant gave pursuant to the compulsion the immunity grant provided. In furtherance of this principle, the courts have held that the evidence at a subsequent criminal trial must be untainted by the immunized testimony, it must be independent of that testimony, or both.

█ It is also clear, however, that, as is so frequently true in the law, care must be taken that a doctrine designed as a shield is not transformed into a sword. As applied to the situation here, this means that the defendant is entitled only to be free from being confronted at a criminal trial with evidence which stems, in one form or another, from the testimony he gave at the immunity proceeding, here the congressional hearing. The defendant is not entitled, however, to be free from any and all prosecutions relating to the subject matter of his immunized testimony, even those which are untainted by that immunized testimony and are independent of it. Such complete immunity, generally called transactional immunity, is not available to the defendant here: it was never granted to him.[4]

## III

### Test Applied by the Court

With this background, it now becomes appropriate to delineate the test the Court is applying pursuant to the decided cases with respect to the government's burden to demonstrate the absence of taint from the

immunized testimony, and its corollary, the existence of independent knowledge by witnesses for the government. The *Kastigar* Opinion states that use immunity "prevents the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." 406 U.S. 453, 92 S.Ct. at 1661.

Based on this *Kastigar* language, defendant argues that dismissal is here required as a matter of law because the government "faces the impossible prospect of tracing all of the evidence accumulated during the course of the investigation and used as investigatory leads to sources wholly independent of the immunized testimony. Each step of the investigative chain by which the evidence presented was obtained must be documented or accounted for."[5] Defendant goes on to claim that, if the Court chooses not to dismiss the indictment outright, the government must "at the very least, call each witness, all grand jury and trial witnesses, all grand jurors, and each member of the prosecution staff who has assisted in this case."[6] As counsel has explained several times at oral argument, in defendant's view the government must, in essence, prove a negative: that, whatever instruction may have been given to grand jurors or witnesses, or whatever the evidence may indicate with respect to the independence of a witness' testimony in relation to Poindexter's immunized testimony in Congress, the government must demonstrate affirmatively that the immunized testimony did not, somehow, in some way, come to the attention of the witnesses, prosecuting attorneys, or grand jurors, and had an influence on their thinking, even

---

**4.** Although the two types of immunity are identified by different terminology, the distinctions between them are not as clear-cut as the terminology suggests. As will be seen below, if "use immunity" is defined expansively enough, it becomes, in effect, transactional immunity. Furthermore, the appellate courts differ as to the extent of use immunity. To cite just one example—some courts define the concept as reaching only to a prohibition on the use by the prosecution of the actual evidence the defendant gave at

the immunized proceeding; others have announced that nonevidentiary uses (*e.g.*, exposure to immunized testimony aiding the prosecutor in cross examination of defendant) are also prohibited.

**5.** *Renewed Motion to Dismiss* at 40.

**6.** *Id.* at 3.

one for which they cannot at this time consciously account.

The Court rejects this absolutist approach. There is no question but that language can be found in a few isolated decisions, particularly in *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973), to support defendant's position.[7] However, with respect to its broad language, *McDaniel* stands alone. Even the Eighth Circuit has since 1973 abandoned the *McDaniel* standard.[8] Similarly, the other Courts of Appeals have criticized *McDaniel* and have refused to follow it. Typical in that regard is the recent decision of the First Circuit in *United States v. Serrano,* 870 F.2d 1, 17–18 (1st Cir.1989). There, the Court stated flatly that it "disagree[d] with the Eighth Circuit's statement in *McDaniel,* 482 F.2d 311, that, where the prosecutor has been exposed to the immunized testimony, 'the government is confronted with an insurmountable task in discharging the heavy burden' of proving no nonevidentiary use," and it suggested that the *McDaniel* approach "amounts to a per se rule that would in effect grant a defendant transactional immunity," 870 F.2d at 17, in contravention of *Kastigar.*

A number of recent decisions which have discussed the *Kastigar* rule in detail mandate application of the rule in a manner that falls short of the broad view espoused by the defendant. Most important for present purposes is the decision of the Court of Appeals for this Circuit in *United States v. Rinaldi,* 808 F.2d 1579 (D.C.Cir. 1987). The court made it clear in that case that where a witness is approached and developed independently of the immunized testimony, or where the law enforcement authorities would have inevitably learned from that independent witness the information that was to be the subject of his trial testimony, no breach of use immunity occurs even if the witness was exposed to the immunized statements. 808 F.2d at 1583. The court further concluded that, if the trial judge could properly find as a fact that a non-immunized witness would inevitably have led the government to yet another witness, the second witness could testify at trial even though he was also identified through immunized statements. Finally, where it appears that the government contacted a witness prior to the grant of immunity, that witness may testify as to what he knows, unless his testimony was influenced by immunized statements that are not "essentially irrelevant to the government's case." 808 F.2d at 1584. Other Circuits are in agreement with the *Rinaldi* rulings or they further expand upon them, as indicated below. Accordingly, the following principles may be distilled from the appellate rulings.

The Court must satisfy itself, and it must be able to find as a fact, that prophylactic measures were taken which, as a practical matter, as distinguished from absolute theoretical certainty, ensure that the evidence to be used at trial was untainted. *See United States v. Byrd,* 765 F.2d 1524, 1528–32 (11th Cir.1985). If in spite of proper precautions, there is some evidence of taint, the indictment will not be dismissed if the untainted evidence is beyond a reasonable doubt substantial. *Serrano,* 870

7. In that case, the court said that the government is precluded from all use of the immunized testimony, including such non-evidentiary use as "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." 482 F.2d at 311.

8. See *United States v. Barker,* 542 F.2d 479, 484 n. 9 (8th Cir.1976), holding that the "extraordinary" *McDaniel* burden was appropriate there only because the prosecution in that case had thoroughly immersed itself in the immunized testimony at the outset of the case; and *United States v. Garrett,* 849 F.2d 1141 (8th Cir.1988),

which affirmed a conviction even though the defendant had given his immunized testimony before the same grand jury that subsequently indicted him. Such a result would not have been possible had the Court of Appeals in 1988 adhered to the language of the 1973 decision.

The *McDaniel* result is explainable only by its peculiar facts: the knowledge law enforcement had of the defendant's immunized testimony was extraordinarily extensive; the United States Attorney "had read the three-volume transcript of McDaniel's [immunized] testimony;" and, as indicated, the indicting grand jury and the grand jury that took the immunized testimony were the same body. 482 F.2d at 309.

F.2d at 15–16; *Byrd*, 765 F.2d at 1530–31 & n. 8; *United States v. Gregory*, 730 F.2d 692, 698 (11th Cir.1984). Moreover, even if the evidence of taint is substantial, the validity of the indictment and of any conviction secured thereunder will still be sustained if the evidence provided by the government's witnesses was derived independently of the immunized testimony. *See Rinaldi*, 808 F.2d at 1583; *Byrd, supra; United States v. Dynalectric Co.*, 859 F.2d 1559, 1578–80 (11th Cir.1988); *see also, Kastigar*, 406 U.S. at 461, 92 S.Ct. at 1665 (Fifth Amendment allows prosecutions using evidence from legitimate independent sources).

The Court will now discuss the specific issues presented by the defendant's motion under three headings: (1) grand jurors and grand jury witnesses; (2) prosecuting attorneys; and (3) trial witnesses.

## IV

### *Grand Jurors and Grand Jury Witnesses*

■ The issues relating to grand jurors and grand jury witnesses were resolved by rulings made by Judge Gesell following an exhaustive factual inquiry [9] when the instant case was still pending before him. Judge Gesell held that the immunized testimony of defendant was not submitted to the grand jury in any form; that this testimony played no part in the grand jury's unanimous decision to indict; and that none of the testimony or exhibits presented to

the grand jury became known to the prosecuting attorneys either from the immunized testimony itself or from leads derived from that testimony, directly or indirectly. 698 F.Supp. at 314–15.

These holdings are the law of the case, and on that basis they are subject to reexamination at a later stage of the same litigation only for exceptional reasons. *International Union, UAW v. Donovan*, 756 F.2d 162, 165 (D.C.Cir.1985); *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1082–83 (D.C.Cir.1984). Not only are there no exceptional reasons for reversing Judge Gesell's holdings; this Court concludes upon its own examination of the facts and the issues that these holdings are clearly correct.

Not a single decision by any court has been cited by defendant or found by the Court holding that an indictment should be dismissed on account of possible grand jury taint in circumstances such as these,[10] or that the defendant is entitled, notwithstanding grand jury secrecy guaranteed by Rule 6, Fed.R.Crim.P., to question "all the grand jurors," [11] or any of them. Indeed, under the rule of *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974), even if the grand jury had been exposed to evidence secured in violation of a defendant's Fifth Amendment rights, the indictment would not thereby be invalidated. *See also, Midland Asphalt Corp. v. United States*, —— U.S.

---

**9.** *See* p. 1490, *supra*. Although counsel for the parties briefed and presented oral argument on the grand jury issues, the dictates of grand jury secrecy and other principles (*e.g.*, increase in pretrial publicity resulting from a broad pretrial *Kastigar* hearing, the spreading of taint from the immunized testimony, the grant of the broadest kind of discovery to defendant contrary to normal practice) prevented their examination of grand jurors and grand jury witnesses.

**10.** The cases cited by defendant in which indictments have been dismissed as a result of grand jury taint involved far more extensive taint than is even alleged by defendant to have occurred here. *See United States v. Anzalone*, 555 F.2d 317 (2d Cir.1977); *United States v. Hinton*, 543 F.2d 1002 (2d Cir.1976); *United States v. Tormos-Vega*, 656 F.Supp. 1525 (D.P.R.1987), *aff'd*

*mem.*, 843 F.2d 1384 (1st Cir.1988); *United States v. Cortese*, 568 F.Supp. 119 (M.D.Pa.1983). In *Hinton* and *Anzalone*, the same grand juries that heard defendant's immunized testimony subsequently indicted him. *Anzalone*, 555 F.Supp. at 318–19; *Hinton*, 543 F.Supp. at 1008–09. In *Cortese*, the government read the defendant's immunized testimony to the grand jury. 568 F.Supp. at 130. In *Tormos–Vega*, an investigator and a prosecutor watched the defendant testify under immunity on television, and the investigator then testified before the grand jury on specific matters that the government admitted had been first mentioned in the immunized testimony. 656 F.Supp. at 1526–29. No circumstances even remotely resembling these are present here.

**11.** Defendant's Memorandum at 11.

——, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989); *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956); *United States v. Blue*, 384 U.S. 251, 255 n. 3, 86 S.Ct. 1416, 1419 n. 3, 16 L.Ed.2d 510 (1966); *United States v. Henderson*, 406 F.Supp. 417, 422 (D.Del. 1975) (immunized testimony). It may be that, where there are indications of extraordinary and widespread taint, even the statutory and traditional grand jury secrecy could be invaded, but this is clearly not such a case.

The grand jurors were instructed several times in emphatic terms and in detail before Poindexter (or any other immunized witness) testified in Congress that they were not to read, listen to, or otherwise pay any attention to testimony at those hearings. 698 F.Supp. at 309–11.[12] There is nothing in the grand jury record to indicate that the grand jurors did not comply with these continuing admonitions.[13] Moreover, much of the grand jury testimony was taken before the immunized hearings ever took place; virtually all the substantive witnesses were known to the prosecution prior to the first immunity grant; and the prosecution was led to these witnesses by sources independent of the immunized testimony. Furthermore, each witness was instructed not to repeat to the grand jury any immunized testimony to which he may have been exposed. 698 F.Supp. at 311–12.[14]

The precautions taken and the instructions given here are fully adequate under the law. In fact, as noted above, convictions have been upheld on appeal even

where *the same grand jury* heard the immunized testimony and indicted the immunized defendant. *E.g., United States v. Garrett, supra;* and cases cited in note 10, *supra.* In light of such precedents, the minor taint defendant speculates on—and that was found to be non-existent by Judge Gesell—could not conceivably invalidate the indictment here. *See United States v. Rogers,* 722 F.2d 557, 560–61 (9th Cir.1983).

While, to be sure, it is impossible to know with mathematical or scientific certainty that each grand juror and each grand jury witness complied with the Court's instructions, in view of the dictates of grand jury secrecy, the absence of precedent regarding grand juror testimony in a *Kastigar* hearing, and the minimal possibility of taint, the Court has no hesitancy first, in following Judge Gesell's ruling in this regard as the law of the case, and second, making the same finding on its own.

## V

### Prosecuting Attorneys

■ Several of the appellate precedents suggest that prosecuting attorneys are not disqualified from trial proceedings even if they were broadly exposed to a defendant's immunized testimony. *See, e.g., United States v. Mariani,* 851 F.2d 595, 601 (2d Cir.1988); *United States v. Caporale,* 806 F.2d 1487, 1518–19 (11th Cir.1986); *United States v. Crowson,* 828 F.2d 1427, 1430–32 (9th Cir.1987).[15] Those conclusions may well be correct.[16] Nevertheless, out of an

---

**12.** Two replacement grand jurors were qualified, one in December 1989 and one in January 1988, after the immunized testimony had been taken before the congressional committees. The Court has reviewed the grand jury records regarding these grand jurors and agrees with Judge Gesell that although they were not questioned in detail about possible knowledge of immunized testimony, they were in the course of events adequately warned. *See Poindexter,* 698 F.Supp. at 311 n. 13.

**13.** Petit jurors frequently are admonished not to pay attention to or be influenced by media accounts and, absent evidence to the contrary, it is presumed that they complied with the instructions.

**14.** "Cooperating" witnesses agreed to avoid exposing themselves to any of the immunized testimony.

**15.** As the Court stated in *Crowson,* 828 F.2d at 1430, the focus of the inquiry under *Kastigar* is not whether the prosecutor was aware of the contents of the immunized testimony but whether he used the testimony against the defendant.

**16.** Defendant's Post–Hearing Memorandum is primarily devoted to an effort to demonstrate that the prosecutors (and even congressional counsel) were exposed to his immunized testimony, and that this improperly tainted prospective trial witnesses. *See, e.g.,* Memorandum at 8, 12–13, 16–20. As discussed *infra,* this is large-

abundance of caution, and in order to provide the most complete protection to defendant's Fifth Amendment rights, the Court has reviewed the record to determine whether the prosecuting attorneys in this case were exposed to that testimony and, as discussed *infra,* it ordered that a special evidentiary hearing be held to dispel any doubt in that regard.

The Court is satisfied that the prophylactic measures summarized in note 1, *supra,* which were adopted by the Independent Counsel to shield the attorneys on his staff assigned to the Poindexter, North, and Hakim cases, were fully adequate to prevent any taint from immunized testimony. The Court accordingly finds as a fact that all attorneys who were subjected to these measures are free of any taint that would call for their disqualification either before the grand jury or at the forthcoming trial.[17]

Two of the attorneys who are expected to participate in the Poindexter prosecution, Dan Webb[18] and Howard Pearl, were not so shielded because they joined the Independent Counsel staff at a much later time. Although these attorneys have filed affidavits asserting that they have no conscious knowledge of the congressional proceedings, the Court has required that they appear at an evidentiary hearing where they were examined by both parties regarding their taint.

Dan Webb, former United States Attorney for the Northern District of Illinois, testified that he had no recollection of defendant's testimony in Congress. At the time that testimony was provided, Webb was in the private practice of law in Chicago, engaged in litigation which consumed many hours every day[19] and took all of his time and energies. He did not watch any of Poindexter's congressional testimony on television, and while he did read about him in newspapers, he has no recollection of any of the facts to which defendant testified.[20] After Webb was hired in September 1989 by Independent Counsel Lawrence Walsh to be the chief trial counsel for the Poindexter case, he followed a procedure similar to that set up for the attorneys who initially joined the Independent Counsel staff: he did not read, listen to, or watch any media accounts relating to Iran-contra, and the Independent Counsel staff has been redacting all news accounts to eliminate references to Poindexter's congressional testimony. None of this testimony was shaken or altered during fairly extensive cross examination.[21]

The testimony of Howard Pearl, a former Assistant U.S. Attorney in Chicago, who was recruited for the Independent Counsel staff by Webb, was in most respects similar to Webb's. Like Webb, he disclaimed any knowledge of Poindexter's immunized testimony, and like Webb, following his employment by the Independent Counsel, he kept himself, and was kept by others, away from Iran-contra news accounts which in any way referred to that testimony. Two matters arose during Pearl's cross-examination from which some element of knowledge might be deduced: (1) in 1987, Pearl became aware of an issue of "what President Reagan knew" and that "he didn't know of a diversion" presumably

---

ly incorrect as a matter of fact. Furthermore, in view of the discredited status of *McDaniel, supra,* and the more recent and more persuasive decisions in *Mariani, Caporale,* and *Crowson,* it is also irrelevant as a matter of law in a situation where, as here, prosecutorial exposure was minor and incidental at best.

**17.** *See United States v. Schwimmer,* 882 F.2d 22 (2nd Cir.1989); *Byrd,* 765 F.2d at 1531–32.

**18.** Mr. Webb is to be the government's chief trial counsel.

**19.** Pursuant to the Court's direction, Webb's diary and time sheets were produced to the defendant.

**20.** That is not too surprising; the Poindexter testimony received substantially less publicity than did that of Oliver North.

**21.** Defendant brought out that Webb was interested in and active in politics; he placed in evidence accounts in the Chicago news media regarding Poindexter's immunized testimony; and Webb testified to various activities which could have resulted in attention to news accounts. However, Webb was entirely unshaken in his conclusion that he could not recall ever having been exposed to any portion of defendant's immunized testimony.

of Iran funds to the Contras (Tr. of December 11, 1989 hearing at 155); and (2) Pearl read part of an article in the *New Yorker* magazine which speculated on the submission of a document showing that the President had approved the diversion (Tr. at 162). The Court has considered these items as well as the entire testimony of Pearl; and it concludes that they are insufficient to disqualify him. His awareness of an issue regarding President Reagan's knowledge of Iran-contra does not indicate exposure to immunized testimony, if only because the issue had become a matter of public interest and speculation many months before Poindexter testified. Similarly, the defendant's cross-examination of Pearl failed to show that he had made inferences based on the *New Yorker* article about the contents of the immunized testimony. The Court will not disqualify—and no court has ever disqualified—a prosecutor based upon so theoretical a possibility of taint.

Since Webb and Pearl have no recollection of the contents of defendant's immunized testimony, neither could possibly make any use of it in "interpreting evidence, planning cross-examination and otherwise generally planning trial strategy." *McDaniel,* 482 F.2d at 311. Thus, even under the broadest view of *Kastigar,* whatever exposure Webb and Pearl might have had is insufficient to disqualify them. Both may therefore participate in the Poindexter prosecution.

## VI

### *Trial Witnesses*

The Court has also taken wide-ranging measures to ensure that trial witnesses would testify on the basis of independent knowledge, as distinguished from knowledge acquired from Poindexter's congressional testimony.

### A. *Principles and Procedures*

It is appropriate to state first the principles the Court is applying in approaching the subject of the testimony of trial witnesses.

Where it appears from the materials reviewed by the Court (*see infra*) that the witness will testify entirely on the basis of his independent knowledge, without any taint or influence from the immunized hearings, he will be permitted to testify at the trial without more. The issue whether an individual would testify solely on the basis of his own independent knowledge is, of course, a factual one, which the Court has resolved on the basis of such factors as whether the information was furnished to the government before defendant gave his immunized testimony, whether the witness' testimony is based on contemporaneous documents antedating the immunized testimony, whether it deals with subjects that were not covered in the immunized testimony, and the like.

The Court could not be certain that, although the witness provided information to the government prior to the taking of the immunized testimony, he might not have been influenced by that testimony in such a way as to change his earlier statements on that basis. Where that was a possibility, the Court considered whether the witness' statements, as proffered by the government, were based in part on post-July 15, 1987 [22] events or appeared to differ from the statements the witness had provided prior to that date. Where the "new" materials only added to earlier statements in slight details that appeared to be of no real consequence insofar as the issues in the case were concerned, the Court decided that *Kastigar* considerations would be satisfied by reliance on the instructions it would give to trial witnesses at the outset of their testimony; its power to cut off lines of questioning if appropriate; and the possibility of a post-trial *Kastigar* hearing.

**22.** July 15, 1987 was the date when Poindexter began his public congressional testimony. Some of the orders issued by the Court referred to the date of June 15, 1987, to take account of Poindexter's statements in executive session, but it now appears that such statements would be irrelevant to the present issues.

With respect to the remaining witnesses, the Court considered their appearance at a pretrial *Kastigar* hearing at which they could be cross-examined by defendant's counsel regarding taint and the independent nature of their testimony. The procedure for selecting those who were to be heard pretrial was as follows.

Initially, the government was directed to furnish to the Court *ex parte* a list of its trial witnesses and a description of their anticipated testimony, with particular reference to the question whether or not that testimony was known to government counsel prior to July 15, 1987, the date Poindexter began giving his immunized testimony in Congress. In response to that direction, the government provided the Court with a synopsis of the anticipated testimony of forty-seven individuals.

The Court considered this submission from the point of view of making a determination whether leads to the testimony or its substance were likely to have come from the immunized testimony of the defendant. With respect to the bulk of the witnesses, all of their proposed trial testimony had been memorialized prior to July 15, 1987, by way of information these same persons had provided to the grand jury, the Federal Bureau of Investigation, the so-called Tower Commission, a congressional committee, or a combination of these.[23] It follows that the testimony of these witnesses was not likely to have been influenced in any way by Poindexter's appearance before the congressional committees. *See United States v. Lipkis*, 770 F.2d 1447, 1451 (9th Cir.1985).

With regard to a smaller number of prospective witnesses, the government's papers claimed that, although much or most of their trial testimony would be confined to subjects and details made known to the government prior to July 15, 1987, on some subjects that testimony would not be so limited. It was also claimed, however, that as concerns the post-July 15, 1987 items, the witnesses would testify exclusively on the basis of actions they had taken themselves or which otherwise were matters within their own participation and knowledge, and thus independent of defendant's immunized testimony.

In order to satisfy itself that the testimony of these witnesses was, in fact, independent of that immunized testimony, the Court studied the witnesses' post-July 15, 1987 grand jury and FBI submissions to determine their subject matter both as to scope and detail, as well as the question whether they did, in fact, relate to facts within the independent participation or knowledge of the witness. In conjunction therewith, the Court also reviewed Poindexter's congressional testimony to catalogue its subject matter and to compare it with the proposed testimony of each of these potential government trial witnesses.

With respect to several of these witnesses, it became clear from these reviews (1) that their testimony will not relate to the subjects to which Poindexter testified pursuant to his grant of immunity, or (2) that the witness' post-July 15, 1987 submissions to the government were only insubstantial elaborations of information the witness had furnished prior thereto. The Court did not require witnesses in these categories to appear for a pretrial *Kastigar* hearing. However, where a determination on the issue of whether an individual's prospective testimony was independent of the immunized Poindexter statements was not possible on the papers filed by the government, the Court directed the government to provide it with additional documentary evidence which might render possible such a determination. Such additional evidence was submitted, and it, too, was reviewed by the Court.

Following the completion of all these procedures, the Court concluded that, to ensure compliance with *Kastigar*, it was appropriate to hold an evidentiary hearing for five of the prospective witnesses. At that hearing, held for three days beginning on December 11, 1989, counsel for the defendant had the opportunity to cross-examine the witnesses regarding possible taint from the Poindexter immunized testimony as

---

**23.** The Court reviewed all the grand jury transcripts and the FBI's "302 Forms."

well as on the issue of an independent source for the witnesses' anticipated testimony.[24] The hearing yielded the following results.

### B. Rafael Quintero

■ Quintero, a former associate of General Secord (one of the Iran-contra defendants) and of Contra leaders, who may be expected to testify at trial concerning assistance rendered to the Contras, testified at the *Kastigar* hearing that while he met a number of times with Oliver North, he did not know Poindexter. Although he watched the congressional Iran-contra televised hearings, including that of Poindexter,[25] he knew nothing of Poindexter except that he was Robert McFarland's successor as National Security Advisor. Quintero further testified that his recollections were based upon his personal knowledge of "things [he] did" and his review of contemporaneous documents.[26] Only in one area did he acknowledge being affected by immunized testimony,[27] and the Independent Counsel has informed the Court that Quintero will not be asked to testify on that topic.[28] The Court has no hesitancy in finding that Quintero is untainted by Poindexter's immunized testimony, and that his proposed testimony has an independent basis.

### C. Associates of Poindexter

■ The remaining witnesses who testified at the *Kastigar* hearing were four associates of Poindexter's at the National Security Council—Ronald Sable, Karna Small, Kenneth deGraffenried, and Oliver North.

Sable and Small will apparently be called at the trial primarily to identify and explain documents prepared during the period when Poindexter was National Security Advisor or Deputy National Security Advisor. In addition, Sable attended meetings with congressional personnel, he participated in drafting responses to their inquiries, and he had discussions with Poindexter regarding the latter's view of Congress.

As concerns his knowledge of Poindexter's immunized testimony, it appears that he was present when that testimony was given, and he also watched other parts of the Iran-contra hearings on television. Sable testified that some details from the hearings colored his perceptions and altered some of his conclusions, but he went on to state unequivocally that his proposed trial testimony would be based upon his personal recollections of the events in which he participated.[29] The witness also stated, again without equivocation or qualification, that the substantive answers he gave to government counsel (and thus presumably the testimony he would give at trial) was not "in any way affected by Admiral Poindexter's immunized testimony." Tr. at 46–47. These statements are entirely credible, indeed they are honest, since it was obvious that the witness, like several others, would have preferred not to

---

**24.** The Court instructed the Independent Counsel that, to avoid tainting the trial prosecutors with information from Poindexter's immunized testimony which was bound to come out as part of the cross-examination at the hearing, he should use for the cross-examination and redirect examination phases of the hearing counsel other than those who would conduct the Poindexter trial itself. There was some dispute between the parties regarding the logistics of this safeguard, but ultimately the Independent Counsel made satisfactory arrangements. While it is unfortunate that such complicated processes had to be set up, the Fifth Amendment and *Kastigar* were best satisfied on this basis.

**25.** He does remember Poindexter's using the phrase "the buck stops here," but no relationship of that comment to other subjects was established.

**26.** As he put it, "[i]f the questions are based on the facts, yes, I can testify without any problem." Tr. of December 11, 1989 hearing at 107.

**27.** Quintero stated that his views regarding his authority to aid the Contras were changed by defendant's immunized testimony. Tr. at 100.

**28.** Government Memorandum at 6.

**29.** While Sable testified that Poindexter's testimony caused him to reach a different conclusion concerning the veracity of McFarland's 1985 letters to Congress, the government will not seek to elicit testimony from him concerning the truth or falsity of these letters. Government's Post–Hearing Memorandum at 4.

testify against his former colleague Poindexter. A claim of having been heavily influenced by the Poindexter testimony might well have permitted him to escape becoming a witness.

Karna Small, who was Senior Director of Public Affairs during the period of the Iran-contra transactions, is expected to testify regarding her handling of two requests made by members of the media for comment on Iran-contra. While she was aware of the contents of the defendant's immunized testimony, she testified that it only "tended to validate my sense that nothing was going wrong, that things were being done in a proper fashion" [30]—an opinion which the government presumably does not intend to elicit from her at trial. The Court concludes that Small's proposed trial testimony is untainted and has an independent basis.

Kenneth deGraffenried, who headed the Intelligence Directorate of the National Security Council, is to testify on three related topics: a November 1986 telephone call from Oliver North to deGraffenried requesting original copies of NSC System IV [31] documents relating to Central America; a subsequent conversation in which Poindexter told him to provide the documents to North; and his actions to facilitate North's request. On June 19, 1987—before he was exposed to defendant's immunized testimony—deGraffenried gave sworn deposition testimony tracking his proposed trial testimony, except to the extent that his memory was then hazy and uncertain as to some events. Subsequently, he heard Poindexter, in immunized testimony, provide a different account of the same events. However, the witness stated flatly several times that the differences strengthened, rather than undermined, his belief in the correctness of his own recollections.[32] Finally, this witness testified that, from the time of his initial testimony before congressional investigators to last week's *Kastigar* hearing, he had always offered a consistent account.

deGraffenried's testimony indicates that he is able to distinguish between his recollections prior to his exposure to immunized testimony and those formed afterwards, and that he is capable of testifying accordingly. Further, an independent basis unquestionably exists for his proposed testimony. The Court therefore concludes that this witness may testify at trial.

### D. *Oliver North*

■ Because of his close association with Poindexter during the events giving rise to the indictment, North may potentially be the most important government witness at trial. At the *Kastigar* hearing, he flatly stated, and he reiterated in various forms during his testimony, that he could not separate his own experiences during the events at issue from what he had heard and read about them in Poindexter's immunized testimony. The Court is skeptical regarding this claim. North has every incentive to protect Poindexter from the damage that might be done to him by the North testimony. The two were working closely together at the National Security Council; they were both charged with similar offenses; and indeed they were co-defendants until their trials were severed last year. It may also be presumed that North is not keen on testifying against anyone on Iran-contra, least of all the person whom he characterized in the hearing before the Court as the only one who "didn't hang Ollie North out to dry." Tr. at 418.

Inasmuch as North was granted immunity from prosecution, he could not refuse to testify against Poindexter on self-incrimination grounds. Thus, the claim that he was unable to tell whether his testimony at Poindexter's trial would be based on his

---

**30.** Tr. at 73–74. On cross-examination and on re-cross, counsel for the defendant was not able to elicit from the witness any additional way in which she was affected by the immunized testimony.

**31.** System IV is a computer system the NSC uses for sensitive intelligence matters.

**32.** deGraffenried testified that Poindexter's account, "sort of gave me more confidence in [my] own recollection," Tr. at 130, and "strengthened my belief that my hazy recollection of those events was correct." Tr. at 143.

own recollection of the events in which he participated, as distinguished from his recollection of the Poindexter immunized statements, represented an obvious alternative means to avoid becoming a trial witness.

As indicated, the Court takes North's alleged inability to differentiate with a grain of salt. It seems unlikely that a witness who was a major and active participant in the events themselves [33] would be unable to distinguish between the version of events described in another's testimony and his own recollection of what occurred. Yet that is what North claimed, and the question is whether the Court's doubts concerning credibility justify it in rejecting his testimony as to the basis for his memory of events.

After considerable reflection, the Court has decided that it will accept the North assertion, and on that basis hold him to be so tainted by his exposure to the Poindexter testimony that his own independent knowledge of the events cannot carry the day. In view of the inability of the judicial system to take independent evidence of the North thought processes, that individual's testimony at the *Kastigar* hearing stands necessarily unrefuted. With the issue in that posture, the Court could decline to credit that testimony only if it were to reject North's assertions as entirely unbelievable.

Were the issue one of lesser gravity, the Court would be prepared to do just that.[34] But the issue here revolves around the constitutional rights of the defendant. At bottom, what is before the Court is the self-incrimination clause of the Fifth Amendment which underlies the immunity—*Kastigar* doctrine—a doctrine which occupies a central place in the American constitutional system. If in its application of the facts to that doctrine the Court is to err, it is most consistent with its obligations to the Constitution and the Bill of Rights that it err on the side of protecting Poindexter's constitutional right not to be convicted with the use of his own testimony.[35] That is accordingly what it will do. North will therefore not be required to testify on any subject with respect to which his testimony is based on the Poindexter statements to the congressional committees.

However, this ruling will not entirely excuse North from appearing as a witness at the trial, for with respect to two areas his recollection could not possibly be confused by the Poindexter statements. First, North gave testimony to the congressional committees before Poindexter did, and his testimony to these bodies therefore could not have been influenced by the statements Poindexter made to them thereafter. Second, not all the evidence North might be expected to provide at the trial was the subject of immunized testimony by Poindexter. If Poindexter did not testify as to a particular matter, testimony at his trial by North concerning that matter would not be an invasion of Poindexter's Fifth Amendment rights.

In accordance with these rulings, the Court hereby directs the government that, although it may call Oliver North as a witness at the trial of this case, it may only elicit evidence from him that will be based on statements made by North prior to July

---

**33.** Moreover, North testified twice without difficulty concerning these events, once before congressional committees and once at his own criminal trial.

**34.** This conclusion is strengthened by the fact that, in spite of repeated prodding, North claimed to be unable to pinpoint a single subject or fact on which the Poindexter testimony did not influence his recollection. That recollection was said to be permeated by that testimony as to all events in which North personally participated. These claims are even more dubious

than the basic claim that, in general, the witness could not separate out his own recollections from the Poindexter immunized statements. However, they neatly serve the purpose of keeping North off the witness stand.

**35.** The burden under *Kastigar* is always on the government to prove that the evidence it proposes to use is derived from a source wholly independent of the immunized testimony. *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664–65; *Rinaldi,* 808 F.2d at 1582–83.

15, 1987, or that was not also the subject of Poindexter's immunized testimony.[36]

### E. *Conclusion*

On the basis of the measures discussed above, the Court is confident that the government's trial witnesses will testify from knowledge that is independent of the information elicited from Poindexter at the congressional hearings. As with any determination that is prospective in character, the Court's finding cannot absolutely ensure that, somehow, some unpredictable trial event may not occur to alter the situation—particularly as several counsel will be examining and cross-examining, and as the witnesses have varying degrees of loyalty to the Independent Counsel or may even be aligned in interest with Poindexter, as well as perhaps having interests of their own. To protect against such contingencies, the Court expects to take several additional measures: (1) it will admonish each witness at the outset of his testimony not to refer to or rely on what he may have heard, read, or learned from Poindexter's immunized testimony; (2) it will cut off any line of questioning, or any answers, that would appear to invade this prohibited territory; and (3) if necessary, it will hold another *Kastigar* hearing at the conclusion of the trial in the event of a conviction of the defendant.

The motion to dismiss the indictment on *Kastigar* grounds is denied.

---

**36.** Where North's information is based on Poindexter's pre-July 15, 1987 statements and was repeated in immunized testimony given after that date, the information has an independent source and may be elicited by the government.